JAMES ZAJIC, ADMINISTRATOR, APPELLANT, V. ELMER JOHNSON ET AL., APPELLEES.

FILED FEBRUARY 21, 1934. No. 28724.

*Crofoot, Fraser, Connolly & Stryker,* for appellant.

*Wear, Garrotto & Boland, Kennedy, Holland & DeLacy* and *Wells, Martin, Lane & Offutt,* contra.

Heard before GOSS, C. J., GOOD, EBERLY, DAY and PAINE, JJ., and HASTINGS, District Judge.

EBERLY, J.

This action was brought by the administrator of the estate of James F. Zajic to recover damages for the latter's death. This fatality was caused by the colliding of a Packard sedan, wherein deceased occupied a rear

seat, with a truck owned by one defendant, of which another defendant was driver, and which truck was then transporting the property of the defendant publishing companies. At the close of plaintiff's evidence the trial court sustained the separate motions to dismiss of the defendants Omaha Bee-News Publishing Company and the World-Herald Publishing Company, for ·the reason that these defendants' were independent contractors in the instant transaction. Thereafter further evidence was adduced and the cause was submitted to the trial jury who returned a verdict for Elmer Johnson and Chester A. Eager, the remaining defendants. From the order overruling his motion for a new trial the plaintiff appeals.

As to the first question, the facts disclosed by the evidence are not in serious dispute. The truck involved at the time of the accident was the property of the defendant Chester A. Eager. It was being driven by the defendant Johnson, who was then employed in that capacity by Eager, from whom he received his compensation. The route followed went from Omaha to Lincoln, to Nebraska City, and to Louisville, all in Nebraska. The truck was one of a number of trucks then owned and operated by Eager in the prosecution of a general trucking business, carried on under the trade-name of the Louisville Motor Transfer Company, with headquarters at Louisville, Nebraska. This business had been continuously carried on for a period of about 14 years. During this period Eager held himself out to the public as ready to engage in the transportation of goods for hire for any one who offered merchandise to be hauled.

The plan followed in carrying on the general business by this defendant was to keep one of his trucks hauling freight on a scheduled run between Omaha and Louisville. The other trucks owned by the defendant were employed in hauling from one town to another as the calls for service might require. It was a daily business of trucking for hire, in performance of which the trucks were owned by defendant Eager, who employed, paid, discharged, and

controlled his drivers and other employees, as the exigencies of the traffic might require.

Up to six years prior to the accident in suit, the Sunday editions of the newspapers published by the defendant publishing companies had been delivered to their patrons in part by railway train service and in part by other means of transportation. The defendant Eager then entered into negotiations to secure this business. Some test runs were made and the results submitted to these publishing companies. Finally an oral agreement for the transportation of the Sunday editions of the Omaha Bee-News and the Omaha World-Herald was entered into whereby these papers, prepared in bundles, labeled, and weighed by the publishers at their respective places of business in Omaha, were delivered to the trucks of the Louisville Motor Transfer Company at Omaha on Saturday night or early Sunday morning, accompanied by lists showing the destination of each bundle of papers thus turned over. The employees of the defendant received these bundles, loaded the same in the trucks and thereafter cared for the same, and deposited each at the place directed. These trucks, exclusively in charge of the motor transfer company's operators and driven to definite places where delivery of papers was required, proceeded in accord with a definite time schedule agreed upon by the parties in interest. The routes followed from one scheduled stop to another were for the determination of the transfer company. It seems that, in the event of an accident to truck or cargo occurring, the fact was to be at once reported to the publishing companies. We infer that the selection of the particular truck for each trip on each route, as well as the employees to man the same, and the furnishing of necessary oil, grease, gasoline and repairs of the fleet of trucks thus engaged, was wholly performed by the defendant Eager. He hired and fired the men engaged. He settled all indebtedness incurred in the transaction, and gave all necessary directions to the employees concerned in, and apparently assumed full responsibility

for the successful completion of, each of the runs made. We have searched the record and find no evidence of control over these movements of the transportation agency either reserved by the publishing companies in this oral understanding, which is controlling, or exercised by them pursuant to its terms. Considering all the evidence, we are impressed with the view that, as a matter of fact, the weekly delivery of these papers, though made pursuant to a special understanding and agreement, was but an incident of the general business carried on by the defendant, and essentially no different in its inherent qualities from that of which it formed a part.

This general business was the undertaking "for hire or reward, to transport the goods of such as choose to employ him from place to place" (10 C. J. 39)—that of a common carrier. *State v. Union Stock Yards Co.*, 81 Neb. 67.

"Persons who engage in the business of draymen, carters, truckmen, wagoners, or public moving van companies for the transportation of goods and merchandise, and who hold themselves out as willing to serve all who apply and pay their charges, are common carriers in respect to the carriage of such goods and merchandise as they make a business of carrying, and it is immaterial what mode of transportation is employed, or that there is no regular tariff of charges." 10 C. J. 49.

Obviously the relation of a public common carrier with its patrons is not ordinarily that of "master and servant." It may be generally conceded "that a common carrier may * * * act as a private carrier, and it has been held that a common carrier may become a private carrier when, as a matter of accommodation or special engagement, it undertakes to carry something which it is not its business to carry." 10 C. J. 39. Plainly the facts in the instant case do not invoke the application of the principle last quoted.

The appellant relies upon *Showers v. Lund*, 123 Neb. 56, *Cole v. Minnick*, 123 Neb. 871, *Standish v. Larsen-Merryweather Co.*, 124 Neb. 197, and *Bowen v. Gradison Construction Co.*, 236 Ky. 270. In none of these cases is the

relation of a public common carrier to its patron considered; hence, the doctrine announced therein can have no application to the instant case.

However, conceding *arguendo* that the status of the motor transfer company is that of a private carrier or contractor, still the facts outlined herein differentiate the instant case from those cited on this point by appellant. Support for this conclusion may be gained from the discussion which the opinions referred to contain. Thus, in *Bowen v. Gradison Construction Co., supra,* the Kentucky court, on the ground of essential difference of the facts involved, distinguished, and in distinguishing approved, two cases, as to which it makes use of the following language:

"This court is not alone in making a distinction between a servant working as Givans was in *Berry v. Irwin* and men working as Owen Richards was in this case; for example in *Paquet v. Pictorial Review,* 130 Misc. Rep. 389, 223 N. Y. 686, Sheridan & Duncan were employed to deliver to the Pictorial Review concern certain paper for which their pay was based upon the weight of the material delivered. The Pictorial Review had a man in charge of the unloading, to check the weight of the material delivered and to tell the men where to put it. In such unloading Paquet was injured. He sued the Pictorial Review Corporation. It was held the plaintiff had no cause of action against the Pictorial Review.

"We could show this same distinction is made by the courts of other states, but we will content ourselves by showing how the United States supreme court does it. * * * In *Standard Oil Co. v. Anderson,* 212 U. S. 215, 29 S. Ct. 252, 53 L. Ed. 480, these were the facts: A stevedore named Terrence was loading with case oil the steamship Susquehanna. He had contracted with the Standard Oil Company for the use of its steam winch and its winchman to do the hoisting, and for this he was to pay the Standard Oil Company $1.50 per thousand. This winchman negligently and rapidly lowered a draft of cases into the hold of the Susquehanna and injured Anderson, for

which injuries he received a judgment against the Standard Oil Company, which was affirmed.

"Let us take another look at these cases. Berry & Kelly had a definite lot of stone to haul and were hauling it, Sheridan & Duncan had a certain lot of paper to haul and they were hauling it, and the Standard Oil Company had a definite amount of case oil to hoist and they were hoisting it. In all these cases it was held these parties were independent contractors."

Obviously the controlling principle in the two cases thus referred to by the Kentucky court is applicable here. The conclusion follows that the publishing companies here had certain papers to haul, and they were having them hauled by "independent contractors," at the time of the accident in suit.

However, even on the basis that the Louisville Motor Transfer Company in this transaction possesses the status of a private carrier, the facts involved remove this from the scope of the controlling principle announced in *Showers v. Lund, supra,* and bring it squarely within the doctrine of the following authorities, which determine in principle that the status of the publishing companies here involved is that of independent contractors: 39 C. J. 1315; 2 Meecham, Agency (2d ed.) sec. 1870; 2 Cooley, Torts (3d ed.) 1092; *Neff v. Brandeis,* 91 Neb. 11; *Bodwell v. Webster,* 98 Neb. 664; *Barrett v. Selden-Breck Construction Co.,* 103 Neb. 850; *Knuffke v. Bartholomew,* 106 Neb. 763; *Petrow & Giannou v. Shewan,* 108 Neb. 466; *Potter v. Scotts Bluff County,* 112 Neb. 318.

It must be admitted that the transaction under scrutiny is not novel in the newspaper world, and that courts of high standing have confirmed the right of newspaper publishing companies to employ private truckers, as independent contractors, to deliver their publications. *Gall v. Detroit Journal Co.,* 191 Mich. 405, 19 A. L. R. 1164; *Schickling v. Post Publishing Co.,* 115 Ohio St. 589; *Abate v. Hirdes,* 9 La. App. 688.

The controlling facts being undisputed, the question

presented was one of law for the court to determine. It follows that its action in dismissing the cause as to the publishing companies was correct and is approved.

With reference to the submission of the issues to the trial jury, complaint is made as to certain instructions given, which, in effect, informed the triers of fact that the negligence of the driver of the Packard sedan, in which the deceased was riding at the time of the accident, if any such negligence was established by the evidence, was imputable to the deceased.

In support of this contention certain decisions of this court are cited, commencing with *Hajsek v. Chicago, B. & Q. R. Co.*, 68 Neb. 539. In this case the rule is announced in the following language: *"Except with respect to the relation of partnership, or of principal and agent, or of master and servant, or the like,* the doctrine of imputed negligence is not in vogue in this state." (Italics ours.)

It will be noticed that the exceptions, as well as the general rule, are substantially reiterated in each of the cases cited by the appellant.

The evidence discloses that James F. Zajic, a musician, for whose death recovery is sought in this action, some time previous to this accident, organized an orchestra of seven men, of which he was one. It was, as disclosed by the record, an unincorporated musical organization for the financial profit of those who comprised it, and adopted as its name the Golden Prague Orchestra. It was the business of this orchestra to furnish orchestral music for balls, dances, and other like entertainments, for monetary consideration, in Omaha and other places in the eastern part of Nebraska. For use in connection with this business, the membership of this organization purchased the Packard sedan in May preceding the accident, had this vehicle overhauled, and had a special contrivance constructed thereon in which to carry their musical instruments. Each of the seven members owned a share in this Packard car. The financial proceeds of the musical en-

gagements filled by this organization were in part divided among the membership and in part devoted to the expenses connected therewith, including gasoline, oil, and repairs for their automobile. So far as disclosed by the record, this automobile was intended to be used solely for the purpose of transporting the membership to and from the engagements filled by the Golden Prague Orchestra. It was thus a necessary part of the equipment made use of in the business they carried on. On the night of the accident it was returning from an engagement at Lincoln, Nebraska, and was in the charge of a member of the orchestra as driver who, it may be inferred from the record, acted in that capacity with the approval, if not as the selection, of the membership of the orchestra, and who was so acting at the time of the collision with the Eager truck, from which the death of plaintiff's intestate resulted, which is now here in suit.

Obviously the Golden Prague Orchestra, in view of the facts stated, was either a copartnership, or an unincorporated association. The latter term may be defined to be a body of persons acting together without charter, but upon methods and forms used by incorporated bodies, for the prosecution of some common enterprise. The common enterprise in the instant case was to carry on a business in which property jointly owned by the membership was employed, in connection with their personal services, for the financial advancement of the membership.

Regarded as a voluntary unincorporated association, it would be "liable in tort for the wrongful acts of its members when acting collectively in the prosecution of the business for which it is organized. * * * So it may be held liable for the tort of an individual member when, in respect to the act complained of, the association occupies the relation of principal." 5 C. J. 1345, 1346.

In any event, in view of the admitted relations between the membership of the Golden Prague Orchestra at the time of the accident and the nature of the business in which it was then employed, its membership present and

participating must be deemed to have been then engaged in a joint enterprise within the meaning of that term as employed in the law of negligence.

There is no substantial conflict in the evidence as to this point, and the question presented as to the legal effect of the conceded relations of the parties was one of law for the decision of the trial court. In this view of the situation, the instruction of the court as to imputed negligence was correct. *Judge v. Wallen*, 98 Neb. 154; *Omaha & R. V. R. Co. v. Talbot*, 48 Neb. 627.

No error affirmatively appearing in the record, the judgment of the trial court is correct, and is

AFFIRMED.