EMORY SKIDMORE, a Minor, by His Next Friend BENJAMIN H. SKIDMORE, Appellant, v. TROY HAGGARD and THE KANSAS CITY STAR COMPANY, a Corporation.—110 S. W. (2d) 726.

Division One, December 2, 1937.

*W. W. Blain, George W. Crowley* and *Lamm & Barnett* for appellant.

*Watson, Ess, Groner, Barnett & Whittaker* and *Mosman, Rogers, Bell & Buzard* for respondents.

HYDE, C.—This case, coming to the writer on reassignment, is an action for $50,000 damages for personal injuries. The court, at the close of plaintiff's evidence, gave a peremptory instruction to find for defendant Kansas City Star Company. The jury returned a verdict against defendant Troy Haggard for $5,000. Plaintiff has appealed from the judgment entered. Plaintiff assigns error, as to the Star, in the direction of the verdict; and, as to Haggard, in the inadequacy of the verdict for the injuries plaintiff sustained.

The Star offered no evidence and it contends that no jury case was made against it because the evidence conclusively shows that the relation of Haggard to it was that of independent contractor. There was an agreement in writing between the parties, and all oral testimony as to the surrounding circumstances, as well as all acts of the parties in connection with the work done, comes from plaintiff's evidence, which was principally the testimony of Haggard himself called as a witness by plaintiff. While the facts and all reasonable inferences therefrom must be considered in the light most favorable to plaintiff's contentions, the relationship must be determined from all of the facts shown by plaintiff, and not from part of them isolated from the rest. [State ex rel. Gosselin v. Trimble, 328 Mo. 760, 41 S. W. (2d) 801.] Since the evidence must be taken as undisputed, the situation here is as stated in Maltz v. Jackoway-Katz Cap Co., 336 Mo. 1000, 82 S. W. (2d) 909, namely: "The relationship was that of independent contractor or of employee— the one or the other—as dependent upon the facts; and on the record here either is exclusive of the other, and the conclusion to be drawn is one of law."

The relation between the defendants commenced about August 7, 1931. Prior to that time, one Alexander delivered papers published by the Star over a route commencing at the junction of Highways 13 and 40 south of Higginsville where Haggard lived. Alexander wanted to sell the route and Haggard paid him $300 for it. Alexander gave him an application to fill out to the Star and went with him to the Star office in Kansas City. They saw the rural circulation manager, who asked Haggard if he knew the route and could

take care of it, and if he thought he would like the work. He answered affirmatively and started delivering over Alexander's route upon his return. Alexander had bought this route in June, 1931, from another party. After he purchased it, Haggard made some changes from time to time in order to deliver to persons who purchased from him, and because of road conditions. On September 2, 1931, a written contract was signed by both defendants.

This contract (omitting preliminary clauses) was, as follows:

"The said First Party is the publisher of the newspapers known as The Kansas City Star, The Kansas City Times, and The Kansas City Sunday Star, and as such publisher, it is necessary to have its papers so published, delivered promptly to various carriers throughout the City of Kansas City, Missouri, and also in the various Counties in the State of Missouri and Kansas; that for and in consideration of the mutual promises herein contained, the parties hereto agree, as follows:

"First. That the second party herein agrees to promptly deliver and distribute newspapers from the office of the Kansas City Star Company, Eighteenth and Grand Avenue, Kansas City, Missouri, to such persons and at such places and along such route or routes, and upon such regular schedule or schedules as may from time to time be designated and furnished by said first party to said second party, and said first party is to designate the routes and schedules for said delivery and distribution, to the carriers and distributors of the Kansas City Star, the Kansas City Times and the Sunday Kansas City Star, and the party of the second part hereby agrees to make prompt delivery of said newspapers and to strictly adhere to said routes and schedules for said delivery and distribution, as shall be designated in writing by the party of the first part, and a strict adherence thereto being the essence of this contract.

"Second. Party of the second part is to collect such amounts of cash from the persons to whom deliveries may be made by the party of the second part as the party of the first part may from time to time fix and prescribe. Party of the second part shall within twenty-four (24) hours from and after making said collections deliver the same to the party of the first part.

"Third. Said party of the first part agrees to pay to party of the second part the sum of $45.00 Dollars per week and . . . stipulated as commissions, as follows: (This blank space not filled in) less the following sums as stipulated damages for defaults and failures of the party of the second part to perform the obligations herein contracted . . . and for each time party of the first part has to hire or procure other vehicles to replace the vehicle or relieve the vehicle of the party of the second part in making deliveries herein provided for, actual costs expended by said first party shall be paid

by the second party, this being dependent upon the price said Kansas City Star Company has to pay a third party for such service.

"Fourth. It is further agreed that said party of the second part shall make such delivery and distribution and collection of funds according to his own means and methods of conveyance, which shall belong to him and be in the exclusive charge and control of the said party of the second part, and which shall not be subject to the control or supervision in any manner by party of the first part, except as to the results of said work. It is hereby expressly understood that party of the first part does not hire or rent the use of said vehicle of the party of the second part, or assume any liability for the use, or the method of using the same."

Haggard's daily routine was to meet a truck, which brought morning papers from Kansas City, at three A. M. at the junction of Highways 13 and 40. He delivered over a route of about 116 miles, which he took about three and one-half hours to cover. He would meet the truck again about three P. M. for afternoon papers. If he did not get there on time the papers would be thrown off for him. This truck was owned and operated by Mr. Otto Matthews, who had a contract with the Star covering the Highway 40 route. Haggard usually received ten bundles of papers, containing about 1300 newspapers and five United States Mail sacks also containing newspapers. He would deliver the mail sacks to the postoffice in the towns on his route, and persons who took the Star's papers by mail would get them in their own postoffice box or from their mail carrier. These mail sacks were sent out from a postoffice substation in Kansas City and the Star paid the postal charges there, but had them hauled to local postoffices with its other papers. Haggard delivered bundles of newspapers to distributors of the Star in towns along his route. These were at Higginsville, Corder, Alma, Blackburn, Mount Leonard, and Shackelford. The rest of the papers that he received were paid for by him and he delivered them to people who took them directly from him.

Haggard apparently only delivered direct to individual subscribers who lived outside of the towns on his route, except that he later took over the subscribers at Shackelford when the local distributor left there. To serve such persons, Haggard went south from the junction to the city limits of Warrensburg before going to any of the towns. He also went east from Shackelford, his last town, to the city limits of Marshall, to deliver to his own subscribers. Haggard had twenty or more subscribers at the Confederate Home north of Higginsville but employed and paid someone else (first Polla, then Weaver) to deliver and collect for him there, while he was driving the rest of the route. The papers he sold to his customers were purchased by him from the Star at the rate of seven and one-half cents per week and he resold them to his customers at

the rate of fifteen cents per week or sixty-five cents a month. Those were ordered from the Star by Haggard and paid for by him. If he bought any papers at any time from the Star that he did not re-sell, he destroyed them but had to pay for them. He paid for all papers ordered for his subscribers at the end of each month. If his subscribers did not pay him he lost what he had to pay for the papers. Several times he ordered his ''draw'' to be decreased because some of his customers did not pay him. On one occasion, he took his pay from a subscriber in coal, and another time delivered papers for two months in payment for being pulled out of the mud. Haggard gave receipts to his customers, which were supplied to him by the Star. This receipt form showed the weeks in each month so that by being punched or checked it showed the time for which the papers were paid. On the back, there was advertising matter concerning the Star's want ad service. Haggard kept a collection book for his own use in checking up the payments made to him by his subscribers. Blank sheets for this book were given to him by the Star. These sheets contained places for the names and addresses and payments of the subscribers. These blank forms came out on the delivery truck and were furnished free for his use in keeping his accounts with his subscribers. He testified that he never collected any money for the Star, except that occasionally one of the distributors would send something in an envelope by him, which had the Kansas City Star address on it, and he would deliver it to the truck when he got his papers; and that occasionally some letter would come out with the papers to a distributor, and he would stick it in a bundle and pass it on to the distributor. Haggard was never given any instructions about a route or schedule but was twice required to send in a map of the route he was covering; and he also made reports showing the time he reached each town each day. Evidence as to other acts of the parties with regard to the work after it had been in progress for some time will be stated after first considering the relationship originally established.

Definitions of master, servant, and independent contractor, made by the American Law Institute's Restatement of Agency, section 2, were recently adopted by this court in Barnes v. Real Silk Hosiery Mills, 341 Mo. 563, 108 S. W. (2d) 58, as follows:

''A master is a principal who employs another to perform service in his affairs and who controls or has the right to control the physical conduct of the other in the performance of the service.

''A servant is a person employed by a master to perform service in his affairs whose physical conduct in the performance of the service is controlled or is subject to the right to control by the master.

''An independent contractor is a person who contracts with another to do something for him, but who is not controlled by the

other nor subject to the other's right to control with respect to his physical conduct in the performance of the undertaking.''

The principal factors to be considered in determining the relation between the parties are set out in Section 220 of the Restatement, as follows:

"(a) The extent of control which, by the agreement, the master may exercise over the details of the work;

"(b) whether or not the one employed is engaged in a distinct occupation or business;

"(c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision;

"(d) the skill required in the particular occupation;

"(e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work;

"(f) the length of time for which the person is employed;

"(g) the method of payment, whether by the time or by the job;

"(h) whether or not the work is a part of the regular business of the employer; and

"(i) whether or not the parties believe they are creating the relationship of master and servant."

In comment (p. 485), it is said that "the important distinction is between *service* in which the actor's *physical activities* and his time *are surrendered to the control* of the master, and *service under an agreement to accomplish results* or to use care and skill in accomplishing results;" that "those *rendering service but retaining control over the manner of doing it* are not servants;" and that "an agent who is not subject to control as to the manner in which he performs the acts that constitute the execution of his agency (even if he is "subject to the fiduciary duties of loyalty and obedience to the wishes of the principal" by "agreeing only to use care and skill to accomplish a result") is in a similar relation to the principal as to such conduct (his physical conduct) in its performance as one who agrees only to accomplish mere physical results." These principles and tests are substantially the same, although stated in somewhat different language, as those set out in recent decisions of this court. [Flori v. Dolph (Mo.), 192 S. W. 949; Coul v. Peck Dry Goods Co., 326 Mo. 870, 32 S. W. (2d) 758; Maltz v. Jackoway-Katz Cap Co., 336 Mo. 1000, 82 S. W. (2d) 909; Rutherford v. Tobin Quarries, 336 Mo. 1171, 82 S. W. (2d) 918; State ex rel. Superior Mineral Co. v. Hostetter, 337 Mo. 718, 85 S. W. (2d) 743; Sargent v. Clements, 337 Mo. 1127,. 88 S. W. (2d) 174; Kourik v. English, 340 Mo. 367, 100 S. W. (2d) 901; Barnes v. Real Silk Hosiery Mills, 341 Mo. 563, 108 S. W. (2d) 58; for authorities in other jurisdictions see 2 Am. Jur. 17, sec. 8; 2

846

C. J. S. 1027; 3 C. J. S. 188; 14 R. C. L. 65, secs. 1-6; 29 C. J. 1316, secs. 1518-26; Annotations 19 A. L. R. 1168; 20 A. L. R. 684, 61 A. L. R. 223, 75 A. L. R. 725; annotation Ann. Cas. 1918C, 627.]

■ At the outset, it would seem that the work done by Haggard was considered by the parties as a distinct and independent business separate from that of the Star because it was purchased by Haggard from his predecessor on the route. [See Bernat v. Star-Chronicle Publishing Co. (Mo. App.), 84 S. W. (2d) 429.] The right to buy and sell the route had apparently been recognized and established by course of previous dealings because Haggard's vendor had also purchased it. It would certainly be most unusual to commence an employment creating the relation of master and servant by buying another employee's job. It was shown that Haggard made an application to the Star and it had the right to refuse to deal with him, so that the sale of the route was subject to its approval. However, that is not inconsistent with an independent contractor relationship because "to obtain the shield of an independent contractor, the owner . . . must . . . select a competent and fit person." [Barnes v. Real Silk Hosiery Mills, supra.] A considerable part of Haggard's work was delivering papers to rural subscribers with whom he dealt direct. This part of his work is not mentioned in the contract herein above set out. It is clear, however, that Haggard bought papers from the Star to resell them at a profit to people living in his territory outside of towns. He paid the Star for them whether he was paid or not, and instances were shown when he reduced the daily number of papers he purchased because of bad accounts. He took pay in goods or services instead of in money; changed his route to be able to sell to new customers; employed a carrier to deliver to a group living close together at one point (the Confederate Home); took over additional selling territory (Shackelford); and otherwise conducted his activities with relation to individual subscribers as an independent business. Restrictions as to territory and as to selling prices are modern business practices even between manufacturers and merchants dealing in various kinds of products. In this part of his work, it would seem that Haggard was even more independent of any control over his physical activities and over the things he sold than was the hosiery salesman in Barnes v. Real Silk Hosiery Mills, supra, who bought no goods for resale but only took orders for future delivery.

The written contract between the parties, covered the delivery of bundles of papers to distributors of the Star in the towns. It shows that the results sought by the Star were prompt deliveries of the newspapers published daily by it, to carriers in the territory to be covered by Haggard. It clearly and specifically leaves the means and methods for accomplishing results to him. The recitals of the

fourth paragraph would unquestionably create an independent contractor relation unless changed, directly or by implication, by some other part or by the effect of the contract as a whole. The provisions pointed out and claimed by plaintiff to have such effect are: (a) The right to designate routes and schedules for delivery to carriers and distributors; (b) a fixed weekly salary; (c) the right to terminate the relation at any time without notice; (d) the right to have Haggard collect for the Star from the persons to whom he made deliveries. These provisions were (except as to collecting) contained in a similar contract considered by the Supreme Court of Michigan in Gall v. Detroit Journal Co., 158 N. W. 36, 19 A. L. R. 1164. The court said that "the right, on the part of the company, to designate the persons and places was but a right to designate the result to be obtained, and did not give the company any control over the method for obtaining that result;" and that "no reason is seen why a man may not agree, as an independent contractor, to deliver all, or part, of the groceries sold by a groceryman, or the goods sold by a merchant, if the method and means for doing so are left entirely to him without any right of control by the employer." In Coul v. Peck Dry Goods Company, supra, the driver (held to be an independent contractor) was directed what to deliver and where to take it, while there was no fixed time to start deliveries, the value of goods to be delivered did not depend upon time of delivery. The right to designate routes and schedules in this kind of a situation (where the value of the articles to be delivered—newspapers—depended upon reasonable promptness in their delivery and which would become practically worthless after a certain time) would seem to be similar to the right to designate plans and specifications to be followed in other kinds of work and which is not inconsistent with an independent contractor relation, if it only amounts to a designation of the kind of result desired and the contracting agent is otherwise left free to reach it by his own methods. Agreements in building contracts for completion within a time limit surely would not make the contractor an employee. Haggard had the right to accomplish these results by substituting other vehicles or other drivers and did do so. It was the prompt delivery and not his personal physical service in making it that was specifically provided for by the contract.

As to method of payment, it is to be noted that while Haggard was to be paid the same amount each week if the agreed results were accomplished, nevertheless, if he was not ready to do so, he was required to pay the Star what it had to pay a third party to accomplish it. This is surely as inconsistent with the relation of master and servant as was the commencement of these parties' relation by bargain and sale of the route. If a servant fails to report for his task, he is not required to pay the cost of getting it done. In light

of this obligation, it appears that the right of either party to terminate the contract at any time was as much for Haggard's protection as for the Star. Otherwise, even if he desired to change his occupation or residence, he would have been obligated for some period to pay the cost of the Star's deliveries in his territory. The right to have him make collections, under the custom and methods shown by the evidence, apparently meant only to require him to receive money while making deliveries on his route and transmit it through the contract driver from whom he received his papers. It was only shown that he received sealed envelopes and delivered them to the truck which brought the papers from Kansas City. We do not consider that this provision of the contract imposed upon him duties as a collector sufficient to change the relationship, otherwise established, because it fixed no time for making collections and did not require him to make trips for collection purposes only, but specifically left this to be done by his own means and methods. For other cases holding the relation of independent contractor to exist between newspapers and carriers see Birmingham Post v. Sturgeon (Ala.), 149 So. 74; Bohanon v. McClatchy Pub. Co. (Cal.), 60 Pac. (2d) 510; Zajic v. Johnson (Neb.), 253 N. W. 77; Creswell v. Charlotte News Pub. Co. (N. C.), 168 S. E. 408; Post Publishing Co. v. Shickling (Ohio), 154 N. E. 751; Schnickling v. Post Publishing Co., 155 N. E. 143; Tyler v. MacFadden Newspapers Corp. (Pa.), 163 Atl. 79; Carter Publications v. Davis (Tex. Civ. App.), 68 S. W. (2d) 640.]

Plaintiff cites Schmitt v. American Press (Mo. App.), 42 S. W. (2d) 969, Semper v. American Press, 217 Mo. App. 55, 273 S. W. 186, and Hoelker v. American Press, 317 Mo. 64, 296 S. W. 1008, in all of which the evidence was held sufficient to show the relation of master and servant between a newspaper and a carrier. In the Schmitt case the defense of independent contractor was abandoned and therefore was not considered. In each opinion in the other cases, the court distinguished the facts from those in Gall v. Detroit Journal Company on the ground that "right of control of the means was assumed and exercised by the defendant," while in the Gall case there was an express agreement that it should not do so. In those cases also the employment seemed to contemplate personal physical service by the individual employed without right of substitution. Moreover, there was no agreement to pay the cost of delivery trips if the carrier did not make them, no purchase of the route, and no purchase and sale of any papers. We, therefore, hold that neither the supplying of papers to rural subscribers nor the written contract created a master and servant relation between the Star and Haggard; and that in its inception Haggard's status was that of independent contractor.

Plaintiff, however, contends that even if the original relation was that of independent contractor, there was sufficient evidence to

show that the Star later assumed and exercised such control over Haggard's work as to change it to that of master and servant. Methods adopted my Haggard, claimed to indicate this change of relation by the Star's assumption of greater control than the contract contemplated, have already been considered in our ruling on the character of his business of selling direct to individual subscribers. Other matters relied upon can be classified either (1) as efforts to maintain and increase subscription lists, or (2) as specifications or suggestions about keeping records and making reports concerning the work, or (3) as service not required by the contract covering delivering to towns.

In the first classification the following should be placed: That Haggard was notified of and investigated complaints from his individual subscribers; that he solicited new subscribers near his route to whom he could deliver papers; that he solicited subscriptions to be sent by mail; that he hauled free other solicitors (sometimes he asked for them to come) who attempted to get subscribers along his route; that he was urged to get more subscribers; that on one occasion, when asked by letter to come to the Star office in Kansas City, he went there and agreed to try to increase the number of his individual subscribers by ten within fifty days; and that he was furnished free sample copies of the Star papers to give to prospective subscribers. As to the second classification, it was shown that Haggard was furnished blank form subscriber's receipts and account sheets for his own records; that he twice was requested to and did send in a map of his route; that he made reports showing the time he reached each town on his route each day; that he sent in lists of his individual subscribers; and that he sent in a monthly report of the number of papers he got each day. In the third, it was shown that Haggard also carried the United States mail sacks, containing newspapers, to the postoffices on his route without extra compensation; that he delivered form letters to the Star's distributors (with the newspaper bundles) in the towns on his route; and that after the collision, in which plaintiff was injured, he made his route for two days in a car belonging to Otto Matthews who had the Highway 40 route.

Are these things inconsistent with the original relation? Efforts to maintain and increase the volume of business would be expected of a distributor or seller of any kind of goods. Producers, wholesalers, and manufacturers aid independent merchants by advertising, giving samples, and making demonstrations. Solicitation of new subscribers would not only increase Haggard's income but would also increase the value of his business in case he desired to sell it. Businesses of many kinds, depending for profits upon volume of sales, are no doubt conducted through independent salesmen or merchants because better results are to be expected (when building

up the sale of the producer's articles builds up the seller's own business and income) than by employees on fixed wages. Moreover, plaintiff's brief assumes that Otto Matthews and his brother and others, who helped Haggard solicit subscribers, were employees of the Star. The record does not show what their contracts with the Star were, but insofar as it indicates anything about their relation, it tends to show that one of the Matthews had a contract for the Highway 40 route, so that his status with the Star would have been the same as Haggard's. Whether Matthews asked for solicitors or what any of them gained by increasing circulation was not specifically shown, except that all solicitors did receive 25% on subscribers by mail. Generally a subscription solicitor would be like a life insurance agent, who is expected to bring about only contractual relations. [See Vert v. Metropolitan Life Insurance Company, No. 34612, decided May Term, 1937, not yet published.] Aid or suggestions from the Star by free sample copies, receipts and account sheets was neither an assumption of control of Haggard's physical activities, nor a direction concerning his physical conduct in reaching the results for which the Star contracted. Reports as to his route, schedule, subscribers, and papers showed only accomplishment of the results contracted for and helped to keep correct financial accounts between the parties. [As to samples, blanks, and reports see Barnes v. Real Silk Hosiery Mills, supra.] Certainly making investigations and requiring reports to find out whether the contract was being performed could not affect their relationship. If Haggard was left to his own means and methods of accomplishing delivery of newspaper bundles to distributors, he surely had the same freedom of choice as to making delivery of form letters sent with them and of United States Mail sacks also received with them for postoffices in the same towns. Borrowing a car from Matthews, without any showing of the Star's interest in it, proves no control by the Star but in fact emphasizes his freedom of choice as to means and methods of making deliveries. We hold that the evidence was not sufficient to show an assumption of control, of the physical activities of Haggard, so inconsistent with the original relation of independent contractor as to change his status to that of servant or employee. The judgment must, therefore, be affirmed as to the Star.

Plaintiff's further contention is that the verdict of $5000 against Haggard was so grossly inadequate that the judgment should be reversed on that ground. Plaintiff lost the sight of his right eye. He also had evidence tending to show a sympathetic affliction of his left eye, which caused considerable pain for some time, an impairment of hearing, and an abdominal injury causing traumatic appendicitis, because of which he had an appendectomy operation. Plaintiff was able, however, to continue in school. The largest judgment we find to have been reversed on appeal for inadequacy, after

the trial court approved the verdict, is $1000. [Grodsky v. Consolidated Bag Co., 324 Mo. 1067, 1082, 26 S. W. (2d) 618 ($1000 for fractured pelvis); see, also Strange v. Ardison (Mo. App.), 65 S. W. (2d) 115 ($500 for fractured skull; In Boggess v. Metropolitan Street Railway Co., 118 Mo. 328, 23 S. W. 159, 24 S. W. 210, the court refused to reverse $1000 judgment.] In the Grodsky case, this court stated the rule to be that generally "in actions for damages judgment would not be set aside on the sole ground of inadequacy, . . . but this rule is subject to the well-recognized exception, above noted, that appellate courts will interfere when upon a consideration of the whole record the judgment is so shockingly inadequate that it can be explained only as the result of passion, partiality, or prejudice." This verdict was for a substantial amount and, while a larger amount would have been sustained as reasonable, considering the standards fixed for injuries by our Workmen's Compensation Act, we cannot hold that this judgment "is so shockingly inadequate that it can be explained only as the result of passion, partiality, or prejudice."

The judgment is affirmed. *Ferguson* and *Bradley*, *CC.*, concur.

PER CURIAM:—The foregoing opinion by HYDE, C., is adopted as the opinion of the court. All the judges concur except *Douglas, J.*, not voting because not a member of the court when cause was submitted.