Seung LEE, Appellant,

v.

PULITZER PUBLISHING COMPANY, Respondent.

No. ED 79812.

Missouri Court of Appeals, Eastern District, Division Two.

May 21, 2002.

Motion for Rehearing and/or Transfer to Supreme Court Denied July 23, 2002.

Application for Transfer Denied Aug. 27, 2002.

Gary Alan Growe, James D. Bass, Clayton, MO, for appellant.

Russell F. Watters, Thomas M. Ward, St. Louis, MO, for respondent.

GEORGE W. DRAPER III, Judge.

Seung Lee (hereinafter, "Lee") appeals from the trial court's judgment granting summary judgment in favor of Pulitzer Publishing Company (hereinafter, "Pulitzer"). Lee claims the trial court erred in granting summary judgment in favor of Pulitzer because there were genuine issues of material fact with respect to whether Pulitzer's newspaper carriers were independent contractors or employees. Lee alternatively claims if the carriers are deemed independent contractors, then the trial court erred in granting summary judgment because there are genuine issues of material fact as to whether Pulitzer negligently selected and retained these carriers. We affirm.

Pulitzer is a corporation who publishes, markets, sells and distributes the St. Louis *Post–Dispatch.* As a part of its marketing, sales and distribution efforts, Pulitzer has established a network of carrier routes, each of which encompasses an exclusive geographic territory. Some carrier routes are owned and operated by Pulitzer while others are owned and operated by individuals Pulitzer has designated as independent contractors pursuant to a Home Delivery Service Agreement (hereinafter, "the Agreement"). The Agreement governs several areas, *inter alia,* relationship, liability, taxes, delivery, fees, billing and collections, carrier delivery area, assignments, delivery lists, and termination.

The Agreement states that carriers are self-employed independent contractors and not employees of Pulitzer. Carriers have the right to choose their own employees and "shall have the right to engage such other subcontractors as the Carrier may deem necessary ... and the Carrier shall exercise the sole and exclusive control and supervision over all said persons." Carriers may engage in other business activities so long as it does not interfere with the

performance of their duties under the Agreement. Carriers are responsible for the costs of conducting and operating their businesses, including the provision of office space, transportation vehicles, equipment, and other supplies. The Agreement specifies Pulitzer "is interested only in the results to be obtained by the Carrier ... and the manner and means to be employed by the Carrier are matters entirely within the authority and discretion of the Carrier over which [Pulitzer] has no authority or jurisdiction."

Further, the Agreement requires that carriers maintain liability insurance on all vehicles and present evidence of such coverage upon Pulitzer's request. Carriers must carry liability insurance in the amount of $100,000 for bodily injury of each person, $300,000 bodily injury for each occurrence, and $25,000 property damage on all vehicles. Carriers are responsible for paying all payroll expenses for their employees and must file their tax returns on the basis of their status as independent contractors.

The Agreement mandates that carriers deliver the daily and Sunday papers according to the performance standards set forth in the Agreement. Pulitzer retains the sole discretion to amend these performance standards upon ten days' prior written notice. Pulitzer also designates the carriers' specific delivery area and provides carriers with a customer list. Pulitzer prohibits carriers from disclosing the customer list or using the list to deliver any other product or material except those designated by Pulitzer. Carriers must return the customer list upon termination of the Agreement.

The Agreement sets forth the fee schedule for delivery of each paper according to the size of the publication. Moreover, the Agreement details how customer billings and collections will be handled. Pulitzer determines all prices charged to the subscriber. Upon Pulitzer's request, the carriers prepare and distribute bills to subscribers and use their best efforts to make collections of the monies owed. If the carriers collect fees, Pulitzer provides the carriers with a weekly accounting statement. Pulitzer does not hold carriers responsible for non-collection from subscribers. Pulitzer offers a collection incentive bonus based upon the levels of collections carriers are able to retrieve. If Pulitzer changes the delivery prices, it informs the carriers, and they notify the subscribers. Finally, Pulitzer may terminate the carriers's obligation to collect fees with sixty days' prior written notice.

An important part of the Agreement at issue in this case is the "Assignment by Carrier" section. It states that the carriers have "the right to sell and assign all or any portion of its rights and obligations under this Agreement at any time to any person for such compensation or payment as may be agreed upon between the Carrier and the assignee ..." with some caveats. First, carriers must give thirty days' advance written notice and must provide Pulitzer with all written contracts which comprise the agreement, along with any additional documentation Pulitzer deems necessary to evaluate the prospective carrier's ability and fitness to perform under the Agreement. Second, Pulitzer must give prior written approval of any such assignment, and may withhold approval for any reason so long as it is made in Pulitzer's reasonable good faith business interest. Third, carriers agree to train the new carrier for a reasonable period of time, and upon completion of this training, Pulitzer will provide the original carrier with a written release from any other obligations under the Agreement.

The Agreements devotes several paragraphs to termination under the Agree-

ment. Initially, this section states that the Agreement shall remain in effect until Pulitzer ceases publication of the St. Louis *Post–Dispatch,* unless otherwise terminated. Should Pulitzer determine that a carrier has failed to perform fully any of its obligations set forth under the Agreement, it may terminate the Agreement by providing the carrier with written notice detailing the reasons for termination. Additionally, Pulitzer may terminate the Agreement for any conduct on the part of a carrier, or any employee, subcontractor, or other person under the control of the carrier which would constitute fraud, misrepresentation, theft, conversion, or dishonesty with respect to Pulitzer or its subscribers.

Finally, Pulitzer shall determine whether sufficient grounds exist for it to terminate the Agreement in its good faith discretion. Carriers then may appeal Pulitzer's decision or must find an assignee within ninety days. In the event they cannot find an assignee, Pulitzer shall purchase the assignment from the carriers.

In December 1988, David Carron (hereinafter, "Carron") began delivering newspapers on Route 261 for Pulitzer after purchasing it for $60,000 from a third party. In May 1991, Carron executed a form of the Agreement with Pulitzer and continued to deliver papers as he had before executing the Agreement. In October 1992, Carron struck and severely injured a jogger while delivering papers along Route 261. Shortly thereafter, in 1993, Pulitzer chose to terminate its agreement with Carron.

Upon Pulitzer's termination of the Agreement, Carron entered into a contract to sell Route 261 to Rommel Medrano (hereinafter, "Medrano") for $90,000. No money changed hands with respect to this transaction, and Carron remained the active operator of the route. Carron hired Jason Meriwether (hereinafter, "Meriwether") to drive the route.

Under the terms of the Agreement, Pulitzer had to receive notice of the sale, together with all information regarding the purchaser. While Pulitzer was required to approve the sale, it did not have to select a purchaser nor did it have the right to select the subcontractor the purchaser could use in carrying out its responsibilities under the Agreement.

Medrano entered into a new Agreement with Pulitzer on August 2, 1993. Medrano and Carron were careful to give Pulitzer the impression that Medrano was Route 261's owner. Medrano attended meetings at the St. Louis *Post–Dispatch.* Carron opened a business checking account and rented a post office box in Medrano's name. He also signed up for electronic voice mail for which Medrano provided the prerecorded greeting. Medrano received the bills for the newspapers purchased at his rented post office box.

On April 8, 1999, Lee and a friend were jogging on the sidewalk along the west side of Hanley when a van driven by Meriwether crossed into the opposite lane of traffic, left the road, and struck both of them. Lee's friend was pronounced dead at the scene. Lee sustained several serious injuries.

Lee filed an Amended Petition for personal injuries, setting forth four counts of negligence against four defendants, Pulitzer, Medrano, Carron, and Meriwether. Count I alleged a general claim for personal injuries against all four defendants and against Pulitzer based on the theory of respondeat superior. Count II set forth a claim of negligence against Pulitzer for negligently approving Medrano as a carrier, negligently allowing its carriers to employ incompetent substitute drivers, and

negligently failing to require adequate insurance to protect the public. Count III asserts a claim against Pulitzer and Carron for negligent entrustment and negligent selection of Meriwether. Finally, Count IV asserts a claim of negligent entrustment and negligence against Medrano.

Pulitzer sought summary judgment on Counts I, II, and III. The trial court granted Pulitzer's motion for summary judgment, holding that *Hougland v. Pulitzer Pub. Co., Inc.,* 939 S.W.2d 31 (Mo.App. E.D.1997) and *Skidmore v. Haggard,* 341 Mo. 837, 110 S.W.2d 726 (1937) were controlling. The trial court stated that the *Hougland* and *Skidmore* cases addressed and rejected claims similar to Lee's, and therefore, Pulitzer did not have a master-servant relationship with Medrano, Carron, or Meriwether. Further, the trial court held that in order for Lee's claim against Pulitzer for negligent entrustment and selection to be viable, there must be a master-servant relationship between Pulitzer and Carron and/or Meriwether, which was not the case here. Finally, the trial court held there was no contractual duty or other relationship between Pulitzer and Carron that would give rise to a duty on Pulitzer's part, and therefore, no causation as to Medrano as an independent contractor. This appeal follows.

It is well settled that when considering an appeal from a grant of summary judgment, we review the record in the light most favorable to the nonmovant. *ITT Commercial Fin. v. Mid–America Marine,* 854 S.W.2d 371, 376 (Mo. banc 1993). Our review is essentially *de novo. Id.* at 376. The criteria on appeal for testing the propriety of summary judgment are no different from those employed by the trial court to determine the propriety of sustaining the motion initially. *Id.* The burden of proof on a summary judgment movant is to establish a legal right to judgment flowing from facts about which there is no genuine dispute. *Id.* at 378.

■ A "defending" party may establish a right to judgment by showing: (1) facts that negate any one of the claimant's elements; (2) that the nonmovant has not been able to produce, or will not be able to produce, evidence sufficient to allow the trier of fact to find the existence of any of the claimant's elements; or (3) that there is no genuine dispute as to the existence of facts necessary to support the movant's properly pleaded affirmative defense. *Id.* at 381.

The nonmovant must show by affidavits, depositions, answers to interrogatories, or admissions on file, that one or more of the material facts shown by the movant to be without any genuine dispute is, in fact, genuinely disputed. *Id.* A "genuine issue" exists where the record contains competent materials that establish a plausible, but contradictory, version of the movant's essential facts. *Id.* at 382.

Lee's first point on appeal claims the trial court erred in granting summary judgment in favor of Pulitzer because there are genuine issues of material fact with respect to the status of Pulitzer's independent contractor carriers. Lee argues there are genuine issues of material fact that show these independent contractors are actually employees which Pulitzer has the right to control. Therefore, Lee asserts that Pulitzer would be liable for her injuries under a respondeat superior theory of liability.

Pulitzer contends that Medrano, Carron, and Meriwether were not employees of Pulitzer at the time of the accident, but rather Medrano was an independent contractor who in turn hired Carron to operate and manage the route. Carron then hired Meriwether to drive the route. Fur-

ther, Pulitzer claims there is no basis for respondeat superior liability because the evidence shows a lack of control or right to physically control Medrano, Carron, or Meriwether in the means and method of transporting and delivering newspapers on its delivery route.

■ Under the doctrine of respondeat superior, if an employee commits negligent acts or omissions within the scope of his or her employment, the employer is liable for the damages. *Hougland,* 939 S.W.2d at 33. Only if a master-servant relationship exists between the parties does the doctrine of respondeat superior act to impose liability on an employer. *Id.* To determine if respondeat superior applies, it must be determined whether the person sought to be charged as a master had the right or power to control and direct the physical conduct of the other in the performance of the act. *Studebaker v. Nettie's Flower Garden, Inc.,* 842 S.W.2d 227, 229 (Mo. App. E.D.1992). If there is no right to control, there is no liability; those rendering services but retaining control over their own movements are not servants. *Id.*

■ If there is no right to control, the person contracted to perform the work is an independent contractor. *Hougland,* 939 S.W.2d at 33. "An independent contractor is one who contracts with another to do something for him [or her] but is neither controlled by the other nor subject to the other's control with respect to his [or her] physical conduct in the performance of the undertaking." *Tom Lange Co. v. Cleaning by House Beautiful,* 793 S.W.2d 869, 871 (Mo.App. E.D.1990). Whether a party is liable under the doctrine of respondeat superior depends on the facts and circumstances in evidence in each particular case and no single test is conclusive of the issue of the party's inter-

est in the activity and the right to control. *Studebaker,* 842 S.W.2d at 229.

■ The principal factors to be considered in determining whether a person is an independent contractor are set forth in the Restatement (Second) of Agency Section 220(2) (1958) as follows:

(a) the extent of control which, by the agreement, the master may exercise over the details of the work;

(b) whether or not the one employed is engaged in a distinct occupation or business;

(c) the kind of occupation with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision;

(d) the skill required in the particular occupation;

(e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work;

(f) the length of time for which the person is employed;

(g) the method of payment, whether by the time or by the job;

(h) whether or not the work is a part of the regular business of the employer;

(i) whether or not the parties believe they are creating the relationship of master and servant; and

(j) whether the principal is or is not in business.

*See Skidmore,* 110 S.W.2d at 730; *Keller v. Missouri Baptist Hosp.,* 800 S.W.2d 35, 38 (Mo.App. E.D.1990); and *Ferguson v. Pony Exp. Courier Corp.,* 898 S.W.2d 128, 132 (Mo.App. W.D.1995).

In *Skidmore,* the Supreme Court held that a newspaper carrier, under a similar contract and responsible for similar duties

to those of Carron in *Hougland,* and Medrano in the instant case, was an independent contractor. Emory Skidmore (hereinafter, "Skidmore") sued Troy Haggard (hereinafter, "Haggard") and the Kansas City Star Company (hereinafter, "the Star") after he was injured in an accident with Haggard while Haggard was delivering newspapers under contract with the Star. *Skidmore,* 110 S.W.2d at 727, 732. At the close of the evidence, the trial court gave the jury a peremptory instruction to find for the Star. *Id.* at 727. The jury later returned a verdict against Haggard.

Skidmore appealed claiming the trial court erred when it issued the peremptory instruction. The Star claimed that no jury case was made against it because the evidence conclusively showed that Haggard was an independent contractor. *Id.* at 727. The Court looked to the contract and Haggard's working habits in order to determine their relationship.

The parties entered into a written contract after Haggard purchased the route for $300.00. *Id.* at 728. Haggard filled out an application and spoke with The Star's circulation manager. After he purchased the route, Haggard made some changes from time to time in order to deliver the paper to persons who purchased from him and because of road conditions. Haggard also incorporated other areas into his route after service was discontinued by another carrier and hired a subcontractor to service this route. *Id.* at 729.

The contract stressed that the newspapers be delivered promptly to various carriers and that Haggard "make such delivery, distribution and collection of funds according to his own means and methods of conveyance, which shall belong to him and be in the exclusive charge and control ..., and shall not be subject to the control or supervision in any manner by [The Star], except as to the results of said work." *Id.* at 728. Either party had the right to terminate the agreement at any time. *Id.* at 731.

Haggard was responsible for the costs of conducting and operating his business, including providing his own transportation and suffering a risk of loss should his subscribers not pay for delivery of the paper. *Id.* at 729. Haggard had authority to accept alternative payment from his subscribers when they were unable to pay with cash or check.

The Star provided Haggard with blank sheets for a collection book, the papers which he had to purchase and deliver, and a weekly sum of $45.00. *Id.* at 728–29. The Star required Haggard to keep subscriber lists, receipts, and account sheets on the blank sheets they provided. *Id.* at 731. Additionally, the Star required Haggard to submit a map of his route, his subscriber list, and reports showing the time he delivered to each customer. *Id.* at 732. The Star also had to the right to designate the customers, places, routes and schedules from time to time, and it could require Haggard to collect money from subscribers for it. *Id.* at 728.

The *Skidmore* Court concluded that the contract "shows the results sought by the Star were prompt deliveries ... [but] clearly and specifically leaves the means and methods for accomplishing results to Haggard." *Id.* at 731. Moreover, the Court noted that the keeping of subscriber lists and accounting sheets was neither an assumption of control nor a direction concerning Haggard's physical conduct in reaching the desired results. *Id.* at 733. Additionally, the Court recognized the parties must have considered the work done by Haggard as a distinct and independent business because Haggard purchased the route. *Id.* at 730. Finally, the Court noted, "restrictions as to territory and as to

selling prices are modern business practices even between manufacturers and merchants dealing in various kinds of products." *Id.* at 731. Based on the foregoing, the *Skidmore* Court concluded that "the evidence was not sufficient to show an assumption of control of the physical activities of Haggard, so inconsistent with the original relation of independent contractor as to change his status to that of a servant or employee." *Id.* at 733.

Building upon *Skidmore*, this Court made similar findings in *Hougland v. Pulitzer Publishing Company.* In *Hougland*, this Court addressed similar issues involving a carrier's employment status with Pulitzer. Hougland sustained serious permanent personal injuries when she was struck by a van driven by Carron.[1] *Id* at 32. At the time of the accident, Carron was delivering papers for Pulitzer under the Agreement. Hougland appealed the trial court's entry of judgment notwithstanding the verdict after a jury entered judgment against Pulitzer in her favor. *Id.*

This Court pointed out "[r]eview of the transcript reveals that none of the witnesses' testimony disputed or called into question the terms of the two documents under which Carron provided services to Pulitzer." *Id.* at 33. In light of the undisputed terms, the Court stated that the determination of the relationship between Carron and Pulitzer would be based solely on the interpretation of the documents. *Id.* As such, the interpretation of contract provisions was purely a matter of law to be determined by the trial court and not an issue for the jury to decide. *Id.*

After an extensive discussion of *Skidmore, supra,* this Court determined that it controlled the outcome in *Hougland* and affirmed the trial court's entry of judg-ment notwithstanding the verdict in Pulitzer's favor. *Id.* at 35. That Court concluded that the evidence was insufficient to show that Pulitzer assumed control of Carron's physical activities which would be inconsistent with his classification under the documents as an independent contractor. *Id.*

Lee attempts to distinguish *Hougland* and its reliance on *Skidmore* from the instant case by claiming that in *Hougland* there was no evidence to dispute the terms of the Agreement. Here, Lee argues, there are several disputed factual differences with the Agreement. Lee focuses primarily on the fact that the agreement between Medrano and Carron was a sham and that there was never any intention by Medrano to run the route.

■ This argument is unpersuasive. First, the sales contract between Medrano and Carron is a separate, distinct, and independent transaction from the relationship established by Medrano and Pulitzer under the Agreement. Second, the Agreement designates Medrano as independent contractor. The Agreement specifically states that the carriers have the right to choose their own employees and "shall have the right to engage such other subcontractors as the [c]arrier may deem necessary." Additionally, "the [c]arrier shall exercise the sole and exclusive control and supervision over all said persons." Even if the arrangement was a sham, the act of allowing Carron to continue operating the route was permissible under the terms of the Agreement and was within Medrano's discretion. The Agreement makes it clear that Pulitzer has no control or supervisory powers over such persons.

Lee points to other factual differences which she claims show how Pulitzer controlled Medrano and Carron as employees

---

1. David Carron was the carrier involved in both *Hougland* and the instant case.

under the Agreement. These include: (1) retaining control over the price of its papers; (2) specifying the times and places for the delivery of its papers; (3) requiring deliveries to meet its written performance standards; (4) Carron not possessing a distinct and separate business from Pulitzer; (5) the Agreement not requiring specialized skills or training; (6) providing certain supplies to its carriers; and (7) considering the long-term duration of the contract. These factors have been considered and rejected by the Supreme Court in *Skidmore, supra* and need not, therefore, be addressed again here.

Finally, the Agreement is the identical agreement that Carron was working under in *Hougland.* Here, the only difference is that Medrano is the named party under the contract, not Carron. Further, the same terms and conditions apply to Medrano under the Agreement as they did previously to Carron. *Hougland* held, under the exact factual situation presented here, that

> the evidence was insufficient to show Pulitzer assumed control over Carron's physical activities to be inconsistent with his classification under the documents as an independent contractor. Carron contracted with Pulitzer to deliver its newspapers, but was neither controlled by Pulitzer nor subject to Pulitzer's control with respect to his physical conduct in the performance of delivering these newspapers. Because there was no right to control, Carron was an independent contractor. Because Pulitzer did not have the right to control Carron's actions, the doctrine of respondeat superior does not apply to hold Pulitzer responsible for Carron's negligence while delivering newspapers.

939 S.W.2d at 35.

Similarly, the evidence before the trial court on summary judgment in this case was not sufficient to create a genuine issue of material fact as to the characterization of Pulitzer's relationship with Medrano, Carron, or Meriwether. Point denied.

Lee's second point argues that even if we hold that Pulitzer's carriers are in fact independent contractors, then there are genuine issues of material fact that preclude summary judgment in Pulitzer's favor because there are disputed facts as to whether Pulitzer negligently selected and retained incompetent independent contractors. Lee alleges Pulitzer negligently failed to investigate the sale of the delivery route from Carron to Medrano, failed to supervise Medrano and Carron's activities, and failed to require adequate insurance to protect the public.

 In Missouri, an employer will be held liable for the negligent action of an independent contractor when the employer fails to exercise reasonable care to hire a competent contractor. *Sullivan v. St. Louis Station Associates,* 770 S.W.2d 352, 356 (Mo.App. E.D.1989). An employer has a duty to select a "skilled and competent" contractor. *Id.* Therefore, when the contractor chosen is in fact competent, the employer will not be liable for the contractor's negligence despite any lack of care used in the selection. *Id.* It is well recognized that a contractor's negligence in conducting the work it was hired to do creates no presumption that the employer was negligent in selecting the contractor. *Id.*

 The Restatement (Second) of Torts Section 411 (1965) states that an employer is subject to liability for physical harm to third persons caused by his [sic] failure to exercise reasonable care to employ a competent and careful contractor

> (a) to do work which will involve a risk of physical harm unless it is skillfully or carefully done, or

(b) to perform any duty which the employer owes to third persons.

Comment (a) states the words "competent and careful contractor" denote a contractor who possesses the knowledge, skill, experience, and available equipment which a reasonable person would realize that a contractor must have in order to do the work which he or she is employed to do without creating unreasonable risk of injury to others, and who also possesses the personal characteristics which are equally necessary.

In this case, Lee presented no evidence that would prove the prerequisite element of incompetence on Medrano's part. Lee presented no evidence that Medrano had a poor safety record, a poor reputation, or that he lacked sufficient expertise and experience to act in the capacity as a carrier under the Agreement. *See Sullivan*, 770 S.W.2d at 357. Lee argues in her first point that Medrano did not have the specialized skills necessary to create an employer-independent contractor relationship because the "only job requirements are the ability to drive, stuff papers in bags and throw papers." Conversely, for this point, Lee argues Medrano was not competent because he did not receive any training and he had no prior experience as a deliveryman. This is not sufficient to create a genuine issue of material fact as to the hiring and retention of Medrano.

Moreover, Medrano's retention of Carron as its subcontractor does not affect Pulitzer's liability under the Agreement as discussed above. As stated earlier, Medrano had the authority to hire whomever he wanted as a subcontractor, and Pulitzer exercised no control over these subcontractors. Furthermore, neither Medrano nor Carron were operating the vehicle at the time of the accident.

Finally, Lee argues she stated a cause of action against Pulitzer for its negligence in requiring carriers to carry only $100,000 in liability insurance. Lee argues once Pulitzer took affirmative steps to require its carriers to have liability insurance, it can be held liable if it performed that function in a negligent manner. We disagree.

Pulitzer's requirement that carriers carry a minimum $100,000 in liability insurance exceeds the minimum level of liability insurance required by Missouri's Motor Vehicle Financial Responsibility Law, Section 303.190 RSMo (2000). We will not impose a greater burden of liability on Pulitzer when its minimum exceeds that provided for by law. Point denied.

The judgment of the trial court is affirmed.

MARY R. RUSSELL, J., and MARY K. HOFF, J., concur.