Harold BONENBERGER and Mary Bonen-
berger, Plaintiffs-Respondents,

v.

SEARS ROEBUCK AND COMPANY, a Cor-
poration, Defendant and Third-Party
Plaintiff-Respondent,

MAINTENANCE SHEET METAL COMPA-
NY, Defendant and Third-Party
Defendant-Appellant.

No. 32968.

St. Louis Court of Appeals.

Missouri.

Dec. 16, 1969.

Motion for Rehearing, or for Transfer
to Supreme Court Denied
Jan. 14, 1970.

Morris, Wuestling & James, Burton H. Shostak, Leroy M. Steiner, St. Louis, for defendant-appellant.

Robinson & Ehrhart, Lawrence E. Ehrhart, Clayton, for plaintiffs-respondents.

LYON ANDERSON, Special Commissioner.

This is an appeal by Maintenance Sheet Metal Company, a corporation, from a judgment rendered in an action brought by Harold Bonenberger and his wife, Mary Bonenberger, against Sears Roebuck and Company, a corporation, and Maintenance Sheet Metal Company. The petition upon which the action was tried is in three counts. Count I was for alleged negligence in the installation of a new furnace and duct system in connection therewith, purchased from Sears and installed by Maintenance. Count II was for personal injuries claimed to have been sustained by Mary Bonenberger as the result of the negligence of a person alleged to be an employee of defendant. Count III was for alleged loss of consortium, etc., sustained by Harold Bonenberger as a result of the injuries suffered by his wife. Issue was joined on the actions pleaded by separate answers filed by each defendant. Defendant Sears filed a counterclaim for recovery on a note executed by plaintiffs at the time the agreement for said sale and installation was entered into between plaintiffs and Sears. Sears also filed a third party claim against Maintenance Sheet Metal Company seeking recovery against Maintenance for all sums that might be adjudged against Sears in favor of plaintiffs under Count I of plaintiffs' petition.

The trial resulted in a verdict on Count I against both defendants in the sum of $750.00. On Count II there was a verdict in favor of Mrs. Bonenberger and against Maintenance Sheet Metal Company for $3,-250.00; a verdict for defendant Sears was directed as to this count. On Count III there was a verdict in favor of Harold Bonenberger and against Maintenance Sheet Metal Company in the sum of $1,-700.00; the court directed a verdict in favor of Sears on this count. The court sustained Sears' motion for a directed verdict on its counterclaim. The jury returned a verdict in favor of Sears and against third party defendant Maintenance Sheet Metal Company for $750.00 Judgment was duly entered on these verdicts, from which defendant Maintenance Sheet Metal Company has appealed. Neither of the plaintiffs nor Sears have appealed from said judgment.

No complaint is made on this appeal with reference to any ruling in connection with the trial and submission of the issues presented by Count I of plaintiffs' petition, or the trial and submission of the issues presented in Sears' third party petition. Appellant's complaints on this appeal are directed against the rulings of the trial court in the trial and submission of Counts II and III of the petition. As heretofore stated, Count II was for damages for personal injuries suffered by Mrs. Bonenberger and Count III was for the alleged loss of consortium, etc., sustained by Harold Bonenberger as a result of the injuries to his wife.

Mrs. Bonenberger was injured when a sledge hammer swung by Percy McGee became entangled in a clothesline causing a hookscrew on the end thereof which was attached to the door frame of plaintiffs' basement door to be pulled out and strike Mrs. Bonenberger in the back of her head. McGee at the time was performing a service for appellant in plaintiffs' back yard and Mrs. Bonenberger was standing nearby. He was attempting to reduce a stoker to small pieces to facilitate its removal from the premises. The removal of the stoker from the premises was an obligation of Maintenance under its contract with Sears. The stoker had been used in connection with the old furnace that had been replaced by the new furnace purchased by plaintiffs from Sears and installed by Maintenance.

Appellant's primary contention on this appeal is that the trial court should have directed a verdict for it as to Count II and Count III. In support of this contention it is urged that there was no evidence that Percy McGee was the agent, servant or employee of defendant Maintenance Sheet Metal Company at the time he swung the sledge hammer, but was an independent contractor engaged by appellant and acting in that capacity at the time Mrs. Bonenberger was injured. Another contention is that plaintiffs' verdict directing instructions, submitting Counts II and III, were erroneous in that both were vague and indefinite and gave the jury a roving commission with reference to a finding of negligence. It is also urged that the court erred in refusing to sustain said defendant's objection and motion for a mistrial when plaintiffs' witness Dr. Walter Moore was permitted to testify that Mrs. Bonenberger developed psychoneurosis as a result of her injury. Said objection and motion was on the ground that said condition was not pleaded. Appellant's final assignment of error is that the verdicts on Counts II and III are excessive.

In determining the primary question presented we must consider the evidence and reasonable inferences therefrom in the light most favorable to respondents, and disregard appellant's evidence not favorable to them and contrary to respondents' evidence. Gardner v. Simmons, Mo., 370 S.W.2d 359. It is also well settled law that "[e]ach case must depend on its own facts and no single test considered alone is conclusive of the ultimate test, the right to control. Timmerman v. St. Louis Architectural Iron Co., 318 Mo. 421, 1 S.W.2d 791, 796; Clayton v. Wells, 324 Mo. 1176,

26 S.W.2d 969, 972; Skidmore v. Haggard, supra (341 Mo. 837, 110 S.W.2d 726). If the facts and legitimate inferences to be drawn therefrom are in dispute the issue is one for the jury. Baker v. Scott County Milling Co., 323 Mo. 1089, 20 S.W.2d 494, 497." Benham v. McCoy, Mo., 213 S.W.2d 914, 919. It has also been held that a case may not be withdrawn from the jury unless the facts in evidence and the inferences fairly to be drawn therefrom are so strongly against plaintiff as to leave no room for reasonable minds to differ. Hastings v. Coppage, Mo., 411 S.W.2d 232; Chappell v. City of Springfield, Mo., 388 S.W.2d 886, 892; Capriglione v. Southwestern Bell Tel. Co., Mo., 376 S.W.2d 205.

The burden of proof was on respondents to prove that Percy McGee was an agent or employee of appellant. They had no burden to disprove the theory of independent contractor which was advanced by appellant. Gardner v. Simmons, supra; Mattocks v. Emerson Drug Co., Mo.App., 33 S.W.2d 142; 57 C.J.S. Master and Servant § 501(2), p. 68.

Harold and Mary Bonenberger are husband and wife and live at 119 South Harvey Street in Ferguson, Missouri. Their home is a story and one-half building with six rooms downstairs and three rooms upstairs. Prior to August, 1964, the house was heated by a coal furnace with a stoker to feed coal into it. The furnace and stoker were working satisfactorily, but plaintiffs decided they wanted a gas type furnace for the convenience of Mrs. Bonenberger. Accordingly, in mid-August, 1964, they entered into a contract with Sears for the purchase and installation of a furnace of that type. At that time there was in full force and effect a contract between Sears and Maintenance Sheet Metal Company whereby the latter agreed, as an independent contractor, to install furnaces sold by Sears in the area wherein plaintiffs' property was located. In said agreement it was also provided that Maintenance Sheet Metal Company would have the sole and exclusive right to hire and have full charge, control and supervision over all its employees.

Installation by Maintenance of the new furnace and duct work began shortly after the signing of the contract between plaintiffs and Sears. The job took three or four days to complete. On the first day there was a crew of men working on the job who were regular employees of Maintenance. There also came to plaintiffs' home two men and a woman. One of these men was Percy McGee. In its answer to Sears' request for admissions Maintenance answered that it "requested another person, Percy McGee to the premises of plaintiff to haul away the old furnace from the yard." The furnace and stoker were dismantled on the first day. Mrs. Bonenberger did not know any of the names of the members of the crew, but indicated that one of the men in the courtroom was in charge. This man was subsequently identified at the trial as James Sheridan, foreman of Maintenance Sheet Metal Company. Mrs. Bonenberger also testified that the crew and the other men were all working at the dismantling job. The old furnace was hauled away by the latter the first day. The foreman told them what they could have off the old furnace, and what plaintiffs desired to keep. Plaintiffs wanted to keep the blower from the stoker for their own use. The foreman gave directions with regard to hauling those things away. After the job was completed the stoker was still in the basement, but the furnace and other parts had been hauled away.

Mrs. Bonenberger further testified that after the furnace was dismantled the condition of the basement was just a "big dirty mess", and after the job was completed the basement was still in that condition. She stated that Mr. Sheridan told her the dirt in the basement would be taken care of. He also told her they would haul away the stoker. Mr. Sheridan testified there was disorder in the basement after the old furnace was dismantled. The concrete base of the furnace was broken into chunks which were lying around on the

basement floor. The base before it was chopped up was six feet long, three feet wide and about two or three inches thick. Mr. Sheridan testified that in addition to hauling away the old furnace McGee also took from the premises some trash consisting of cinders, the furnace liner and the sand from the top of the furnace plenum. He stated he did not tell McGee what to do with the trash, and denied paying McGee for hauling away the furnace and trash. He further testified he directed McGee at the time to leave the stoker and blower.

The transcript shows that over the years there were several other people whose services were used by Maintenance to haul away and dispose of furnaces replaced by new ones purchased from Sears. Margaret Michelswirth produced copies of certain tax forms showing the amounts withheld from the pay of employees for taxes. She stated that the name of Percy McGee was not on the list showing withholdings for the first quarter of 1965. She stated she knew Percy McGee by name only; that she had never seen him; and that she had never paid him any money on behalf of the company or made any authorization for any such payment. On cross-examination she testified that during the last six years payments had been made for hauling away furnaces, but she did not have with her the records to show to whom those payments were made. These records were not produced at the trial. Percy McGee was not called as a witness. She stated that the men who hauled away furnaces for Maintenance were not regular employees.

Plaintiffs' witness, Walter Noble, testified he was present in the Bonenberger home in August, 1964, when some men came there to tear down the furnace. The witness identified the foreman of the crew as Mr. Sheridan. He further testified that thereafter the foreman left, and about an hour or an hour and a half later a truck backed down the driveway and around the garage. Noble, who had been trimming shrubbery in the back yard, approached the truck and as he did so the foreman, Mr. Sheridan, came from around the other side of the truck. There were two other men with Mr. Sheridan as he walked through the basement door. Sheridan told Noble that they were there to get the furnace. Noble followed Sheridan and these two men into the basement. Sheridan then told the men to take the electrical wiring and the furnace. He also told them to break up the furnace, and to take the concrete slabs. He directed them to take the stoker but to leave the blower. These two men loaded the truck with heavy pieces from off the furnace. They could not get all of the concrete chunks in the truck. They did not take the stoker, but pushed it back against the basement wall. They said they could not take the stoker because they had a load. Mr. Sheridan said the men would be back the next day for the concrete chunks and the stoker.

On January 4, 1965, McGee, accompanied by another man and woman, appeared at the Bonenberger premises to remove the stoker. It was on this occasion that Mrs. Bonenberger received her injury as a result of the swinging of the sledge hammer by Percy McGee. The stoker was moved from the basement to the backyard and McGee began hitting it with a sledge hammer in an effort to break it up. The only testimony with reference to this incident was given by Mrs. Bonenberger and her eleven year old son Stephen who was present in the back yard at the time. Stephen was standing about four feet in front of his mother and saw the hookscrew strike his mother in the back of the head. He stated that when this occurred his mother fell to her knees with her head bleeding. Mrs. Bonenberger testified that the sledge hammer came in contact with the clothes line once before; and that she believed the accident happened the next time the man swung. A next door neighbor came over and put a washrag on Mrs. Bonenberger's head. She then went into the house and laid down. Her head was bleeding and she was dizzy. A neighbor's husband took her to a Dr. Rubin in Florissant. The doctor

cleaned the wound, gave her some pills and a tetanus shot. No stitches or bandages were required.

Mr. Sheridan testified that he did not pay McGee for removing the stoker; that if McGee had been paid by anyone at Maintenance he would have known about it; and that as far as he knew McGee went back to plaintiffs' premises to pick up the stoker just for its junk value.

■ In determining whether Percy McGee was an employee of Maintenance Sheet Metal Company or an independent contractor, the test to be applied is whether Maintenance had the right to control the details of the work which McGee performed for it. Benham v. McCoy, supra; Gardner v. Simmons, supra.

■ It is our opinion that there was substantial evidence from which a jury reasonably could find that Maintenance did have the right to control the manner in which McGee performed the services which he rendered for said company. It was the duty of Maintenance to dispose of the furnace and stoker. In addition, it undertook to dispose of the concrete chunks, and trash consisting of cinders, sand and other items. McGee was directed to take these items and dispose of them. He also, according to the testimony of Mrs. Bonenberger, helped with the dismantling job.

The fact that McGee used his own truck in hauling away the furnace, stoker and trash does not require a ruling that as a matter of law he was an independent contractor. Nor does the fact there was no evidence that he was directed to a place of disposal or told which route to take in the performances of these services alter the conclusion that the right of control of such matters could reasonably have been found to be a right possessed by Maintenance. McGee had performed like services before, and no doubt knew the location of such places, and the route to take to them. He needed no such direction. The fact that there was other evidence in the case from which a jury could reasonably find that McGee was, in fact, an independent contractor does not alter the fact that his relationship to Maintenance was under all the evidence a jury question. As heretofore noted, the burden was not on plaintiffs to disprove the theory that McGee was an independent contractor. Their burden was satisfied with the production of substantial evidence from which a jury could reasonably find that McGee was an agent or employee of Maintenance.

Appellant makes much of the fact that the internal revenue reports did not list McGee as an employee, and that he did not pick up furnaces often or with any degree of regularity. The testimony of Mrs. Michelswirth was that the reports contained only withholdings of regular employees. It is true that McGee was not a regular employee, but one may be an employee though not employed with any degree of regularity. And failure to report a withholding as to such person does not affect his status, but might be said to be a matter solely between the employer and the revenue department.

The trial court did not err in overruling the motions for a directed verdict as to Counts II and III.

Under Point II it is urged that the court erred in giving Instructions 6 and 8. Both were verdict directing instructions. Number 6 submitted Mary Bonenberger's case for personal injuries and Number 8 Harold Bonenberger's action under Count III of the petition. Instruction No. 6 was as follows:

"Your verdict must be for the Plaintiff Mary Bonenberger and against Defendant Maintenance Sheet Metal Company on Count II of Plaintiff's Petition if you believe:

"First, the man who swung the sledge hammer in dismantling the stoker was acting in the scope and course of agency for Defendant Maintenance Sheet Metal Company, and

"Second. that the man who swung the sledge hammer did so in a negligent manner, and

"Third, as a direct result thereof the Plaintiff Mary Bonenberger sustained damage."

Instruction No. 8 was identical with No. 6 except that in the third required finding the word "injured" was used instead of the word "damaged", and a fourth added which required a finding that Harold Bonenberger sustained damage.

The court also gave and read to the jury an instruction defining negligence as follows:

"The term 'negligence' as used in these instructions means the failure to use that degree of care that an ordinarily careful and prudent person would use under the same or similar circumstances."

The complaint lodged against Instructions 6 and 8 is that neither presents facts essential in law to support the verdict, but gave the jury a roving commission to choose facts which in their minds would constitute a negligent swinging of the sledge hammer.

The only evidence as to the manner in which McGee swung the sledge hammer, and the facts relative to the conditions existing at the time Mrs. Bonenberger was injured was that offered by plaintiffs. Appellant offered no evidence on this phase of the case. Plaintiffs' evidence showed that the man who swung the sledge hammer was, at the time, in close proximity to the clothes line. Stephen Bonenberger testified that the person who swung it could have untangled it with his hands. He stated: " * * * the clothesline was about I guess as tall as your head, and he could just reach up with his hands, and pull it out, * * *." Mrs. Bonenberger testified that the sledge hammer caught in the clothes line twice; that the first time it got caught McGee just reached up and untangled it; that she was about four feet from him at the time; and that she was hit

a moment later, she believed the next time he swung.

■ Under Civil Rule 70.01(a), (e), V.A.M.R., it is not proper to give instructions which require findings of detailed evidentiary facts. Only ultimate fact issues should be hypothesized. In the case at bar the ultimate fact was the swinging of the sledge hammer in such a manner as to cause Mrs. Bonenberger's injuries. The instructions refer the jury to this incident and require a finding that he swung the sledge hammer in a negligent manner. The court then by Instruction No. 11 defined negligence as the failure to use that degree of care that an ordinarily careful and prudent person would exercise under the same or similar circumstances.

■ In our opinion, after considering the facts of this case, Instructions 6 and 8 are neither vague or indefinite, nor give the jury a roving commission in the determination of the issue of negligence.

Appellant's next complaint is that the court erred in overruling its objection to the testimony of Dr. Moore that Mrs. Bonenberger was suffering from psychoneurosis as a result of her injury, and in refusing to strike said testimony from the record. The basis of the objection and motion was that such condition was not pleaded. It is also urged that the court erred in refusing to declare a mistrial after plaintiffs, at the close of their case, were permitted to amend their petition to include psychoneurosis as one of the ailments suffered by Mrs. Bonenberger as a result of the alleged accident.

Dr. Walter Moore, a specialist in neurology and psychiatry treated Mrs. Bonenberger on numerous occasions. He was called as a witness for plaintiffs. Prior to his taking the stand, Mrs. Bonenberger had testified to certain matters bearing on her mental condition after the accident.

Mrs. Bonenberger testified that after the accident she was very dizzy; that on

the third day after the accident she was still nauseous; that her head felt very large; that her neck felt like somebody had taken it off and did not put it back on right; that she kept having terrific headaches; that the headaches kept getting worse; that her neck condition kept getting worse; that Dr. Pifer treated her about 15 times and until May, 1966; that when she quit going to Dr. Pifer she had very bad headaches and her neck hurt constantly; that she had a dull headache all the time, and a severe headache at least once a week "that would just blind me"; that after she quit Dr. Pifer her headaches and neck condition got worse; that in August she went to see Dr. Moore, and Dr. Moore thereafter sent her to a hospital where she remained 10 days undergoing various tests; that after she left the hospital she was very fearful; that she was convinced she had "something in my head, * * * or a blood clot"; that she couldn't understand how she could have the headaches and her head be all right; that prior to the accident she had no trouble with her neck; that she still had headaches but not as severe as they were; that she never had those headaches or fears and anxieties about her head before the accident; and that she was very nervous.

Dr. Moore testified he first saw Mrs. Bonenberger early in August, 1965. Her last visit to his office was November 15, 1966. From September 29, 1965 to October 9, 1965 she was a patient at St. Mary's Hospital where she was given various tests, including x-rays of her neck, skull and cervical vertebrae. She was also given an electro-encephalographic brain tracing. From these tests Dr. Moore could find no evidence of organic disease of the central or peripheral nervous system. From his neurological examination his diagnosis was that she was suffering from an anxiety state due to her nervousness and fear and apprehension that something was wrong with her brain. The doctor then gave the following testimony:

"Q. This anxiety state, what is that called, Doctor?

"A That's what it is. It is what was the psychoneurosis. That's the name of anxiety state. She was apprehensive or fearful and tense, and, anyway, emotionally unstable, and she has a feeling that there was a possibility of some more serious illness of her body, and I think this created a great deal of her anxiety, and we gave her reassurance, and told her we could find nothing wrong, and gave her a tranquilizer medicine, and told her we would like to see her at a later date if that continued, hoping this might break up her anxiety and lessen her tension.

"Q This was more psychoneurosis, you say?

"A. That's correct."

The foregoing testimony went in without objection by counsel for defendants. Dr. Moore was then asked the following question:

"Q A process of anxiety state and fear?"

To this question counsel for defendant Maintenance objected on the ground that psychoneurosis was not pleaded as an injury suffered by Mrs. Bonenberger as a result of the accident. The court overruled the objection as being untimely, stating that there was previous testimony by Mrs. Bonenberger about her anxiety state, and that Dr. Moore had, without objection, testified there was a definite anxiety state, defining it as synonymous with psychoneurosis. Plaintiffs' counsel then proceeded to develop the nature of such illness. Counsel for Maintenance cross-examined the doctor along the same line, then moved to strike all the doctor's testimony concerning psychoneurosis on the ground that such ailment had not been pled. The court overruled the motion.

Thereafter, at the close of plaintiffs' case, plaintiffs moved to amend their petition by inserting a paragraph therein read-

ing as follows: "'As a direct result of the negligence and carelessness of the defendants as aforesaid Plaintiff Mary Bonenberger was caused to suffer fears, anxiety complex, tensions, strains or suffer a condition known as psychoneurosis.'"

Thereupon, counsel for defendant Maintenance Sheet Metal Company claimed surprise and requested the court to declare a mistrial in order that he might prepare a defense to the matter alleged in the proposed amendment. The court denied this request, and granted plaintiffs leave to amend the petition.

■ From an examination of the evidence which we have here reviewed it appears that Mrs. Bonenberger testified, without objection, to her fears and anxieties. Then Dr. Moore testified in effect that her fears and apprehensions had in fact no reasonable basis, but constituted an anxiety state which he defined as psychoneurosis. Appellant did not object to this testimony at the time it was given, or move to strike same as relating to a condition not pleaded. Later when like testimony was sought appellant's counsel did object on the ground that it went beyond the pleadings. The court overruled the objection as untimely. Later appellant's counsel moved to strike all testimony with reference to psychoneurosis. This motion was denied, and as heretofore stated, appellant's motion for a mistrial was also denied.

We find no error in the court's rulings here under consideration. Evidence admitted without objection brings into effect the provisions of Civil Rule 55.54, V.A.M.R. That rule provides that issues not raised by the pleadings which are tried by express or implied consent of the parties shall be treated in all respects as if they had been raised by the pleadings. The rule also provides that amendments to the pleadings may be made to cause them to conform to the evidence. No doubt it was this rule the trial court had in mind when he made the rulings of which appellant complains. Appellant by failing to timely

object to the testimony of Dr. Moore must be deemed to have impliedly consented to include psychoneurosis, which plaintiffs claimed Mrs. Bonenberger suffered, as one of the issues to be tried. Gathright v. Pendegraft, Mo., 433 S.W.2d 299.

■ Even if it could be said that a timely objection to the testimony was interposed, it is our judgment, after a review of the entire record, that the trial judge could reasonably have been of the opinion that the presentation of the merits of the action would be subserved by allowing the evidence and that appellant failed to satisfy the court that its admission would prejudice the defense on the merits. Under such circumstances the trial judge did not abuse his discretion in refusing to grant a mistrial and continuance.

■ The final contention of appellant is that the verdicts on Counts II and III are excessive. We must, therefore, make a further brief review of the evidence bearing on the injuries sustained by Mrs. Bonenberger and the damage sustained by her husband.

As heretofore stated, Mrs. Bonenberger was taken to the office of Dr. Rubin shortly after the accident. Dr. Rubin cleaned out the wound and gave her a tetanus shot. The next day she was taken to the Normandy Osteopathic Hospital where she was examined and given medicine to relieve pain. She was thereafter treated by Dr. Pifer at his office on ten different occasions. She quit seeing Dr. Pifer in May, 1965. At that time the pain and suffering was not relieved, but in fact was more severe. Dr. Moore examined and treated her beginning the first part of August, 1965. Dr. Moore put her in St. Mary's Hospital where she remained ten days undergoing treatment and various tests. She remained under the care of Dr. Moore until November, 1966. When she went to see Dr. Moore she was suffering from an anxiety state, nervousness, and unusual headaches. According to Dr. Moore this anxiety state brought on by her fears and

apprehensions was very real to her. After she left the hospital Dr. Moore treated her at his office a total of 13 times. His treatment consisted of psychiatry therapy. He stated that the last time he saw her, November 15th, 1966, she still had some apprehensions, but realized she did not have a blood clot. During the time she was treated by Dr. Moore she wore a Thomas Collar, and for three or four hours a day would place her neck in traction. The harness for this was made so that she could use it lying down. Mrs. Bonenberger testified that her head and neck still hurt, but she was relieved of her fear that something was wrong with her head. She stated she still had headaches, but they were not as severe as they previously were. She further testified she could not clean the house like she did before the accident; that if she cleaned real hard with the vacuum her neck starts to hurt. She stated she was very nervous. Her daughters have done the ironing since she was injured. Mr. Bonenberger testified that his wife was very nervous, and had taken tranquilizers and pain pills every day since the accident.

The hospital bill for the ten days Mrs. Bonenberger was there for tests and treatment was $360.25; Dr. Moore's bill for services was $361.00. The evidence does not show the amount of Dr. Pifer's bill, or for the services rendered by the Normandy Osteopathic Hospital. Other items of expense such as the traction harness and Thomas Collar are not shown.

Upon consideration of all the facts heretofore outlined, we cannot say that the verdicts returned under Counts II and III are excessive.

Judgment affirmed.

PER CURIAM.

The foregoing opinion by LYON ANDERSON, Special Commissioner, is adopted as the opinion of this court. The judgment is affirmed.

WOLFE, P. J., and BRADY, J., concur.