James **BRIDGEFORTH** and Sylvia Bridgeforth, his wife, Plaintiffs-Respondents,

v.

Harrison **PROFFITT** and Geraldine Proffitt, his wife, Defendants-Appellants.

No. 9180.

Missouri Court of Appeals, Springfield District.

Jan. 17, 1973.

allegedly spread from defendants' adjacent farm, plaintiffs James Bridgeforth and Sylvia Bridgeforth, husband and wife, obtained a judgment for $3,000 from which defendants Harrison Proffitt and Geraldine Proffitt, husband and wife, appeal. Defendants' insistence here that plaintiffs did not make a submissible case either on the issue of liability or on the issue of damages requires a factual review.

Plaintiffs resided with their two sons, then five and seven years of age, in a 12′ x 60′ mobile trailer home situate on a farm on the west side of a north-and-south country road near Montier in Shannon County, Missouri, and (as the aerial photograph in evidence indicates) about one trailer length north of the east-west fence line between that farm and the adjoining farm on which defendants' home stood "approximately" 150 yards south-southeast of the trailer, so thought plaintiff James, the only witness of whom inquiry was made concerning this distance. In the general area between defendants' home and plaintiffs' trailer, there were four outbuildings, all on defendants' land. No measurement of the distance (a) between either defendants' home or plaintiffs' trailer and any one of those four outbuildings, or (b) from any outbuilding to any other outbuilding, was shown in evidence, and only one of those distances, namely, the distance of "about" three feet from the northwest corner of defendants' home to their *pumphouse*, was even estimated. However, an aerial photograph taken on April 22, 1971, more than one year after the fire, on which all of the relevant structures and sites were identified and lettered by witnesses, provided some information as to relative distances and locations. Roughly calculated, it appears from that aerial photograph that, if a line had been drawn from defendants' *pumphouse* at the northwest corner of their home to plaintiffs' trailer, defendants' *brooderhouse* would have been slightly east of that line and about one-quarter of the distance from the pumphouse to the trailer, defendants' *toolshed* would have been somewhat farther

Woolsey, Fisher, Clark & Whiteaker, Russell G. Clark, Springfield, for defendants-appellants.

Moore & Brill, John C. Holstein, Richard D. Moore, West Plains, for plaintiffs-respondents.

STONE, Judge.

In this jury-tried action at law to recover for the loss of personal property destroyed on April 8, 1970, by fire which

to the east of that line and about midway between the pumphouse and the trailer, and defendants' *"little barn"* would have been a like distance to the west of that line, about due south of the trailer, and less than one-third of the distance from the pumphouse to the trailer. On the date of the fire under discussion, defendants admittedly had an open trash tub which was located "about 30 feet west" of and thus behind their home at a site designated on the aerial photograph. Whether or not defendants (or one of them) had, on the morning of the fire, burned trash in this open tub was a contested factual issue upon trial.

Witness Duane Ledgerwood, "a forestry aid" who had been reared in that neighborhood and had worked 17 years on a ·fire tower southwest of defendants' home, was on duty in the tower when, about 11:30 to 11:40 A.M. on April 8, 1970, he spotted smoke on defendants' land between their home and plaintiffs' trailer. He thought he had seen the fire "when it started up"— "it was a small brown and white ball of smoke." In his opinion, it was "some form of vegetation" burning. Ledgerwood immediately communicated with Rossie Bacher, an experienced pilot employed by the Forest Service who was flying "the fire patrol plane" that morning and asked him to check on this fire. About 11:50 A.M. Bacher called Ledgerwood to come to the scene of the fire and the latter reached defendants' home some ten minutes later. At that time, Ledgerwood observed that plaintiffs' trailer and two of defendants' outbuildings, namely, their brooderhouse and toolshed, were "pretty well consumed," that there was "a continuous fire line" from the trailer "back almost to [defendants'] house," and that the northwest corner of the pumphouse was on fire. He immediately joined defendant Harrison in an effort, eventually successful, to extinguish the pumphouse fire. Ledgerwood could not say whether defendants' little barn was on fire when he arrived, but he knew that it burned before he left. While on duty in the tower that morning he had seen no smoke in the area around defendants' home prior to that spotted about 11:30 to 11:40 A.M.

When, in response to Ledgerwood's request, pilot Rossie Bacher flew over that area "a little before noon . . . the fire was pretty small . . . probably 15 or 20 steps across the fire," and it was entirely on defendants' property. Since vegetation was dry and there was a 25 to 35 mph wind out of the south creating "high fire danger," he immediately reported this "as a wild fire" with no one caring for it and called Ledgerwood to come from the fire tower. At the request of defendants' counsel, Bacher drew a line on the aerial photographic exhibit enclosing the area that was burning when he arrived, the southernmost portion of which was (so defendant Harrison readily conceded on cross-examination) "just a little north" of defendants' trash tub. The only structures within that area were defendants' brooderhouse which had burned already and their toolhouse which was burning. However, the fire "was spreading both ways [but] more rapidly to the north than to the south." And while Bacher made repeated passes over this area to arouse someone in defendants' home or plaintiffs' trailer, he watched the fire spread and saw the trailer and the northwest corner of defendants' pumphouse catch on fire. Finally, defendant Harrison came outside and immediately began to fight the pumphouse fire. By that time Ledgerwood on his way to the fire was within a mile of it, so Bacher left to check another fire.

Four witnesses testified concerning subsequent conversations with defendants Proffitt. The first of these was plaintiff James. Both he and his wife worked in Birch Tree, and knowledge of the fire was first communicated to him by his foreman during the noon hour. When he reached home, he found his trailer and its contents completely burned and observed the volunteer fire department from Birch Tree and "people from the conservation department"

plowing with a little dozer and putting out brush fire on defendants' land. Plaintiff James' account of his conversation with defendants shortly thereafter was that "I talked to Mr. Proffitt and *I ask[ed] him if he knew how the fire started* and he said that 'we had burnt trash' that morning and Mrs. Proffitt said that she had throwed a bucket of water on it to put it out." (All emphasis herein is ours.)

Edwin Rockwell, plaintiff Sylvia's father who lived some 300 yards from plaintiffs' trailer, was not home at the time of the fire, but he talked with defendants at their home the following morning. When asked to "tell what was said by either one of the Proffitts or both of them, *if something was said as to the cause of the fire*," he responded in these words: "Well yes, they both agreed that they had been burning trash and that they thought they had the trash fire out and Mr. Proffitt even stated that he thought his wife had put a bucket of water on it prior to the fire but evidently there wasn't."

Clayton L. Swinson, a farmer near Montier, and his wife drove to defendants' home that same evening to view the damage. Defendants came to the Swinson automobile and, as witness Swinson reported, "we started talking and during the course of the conversation Mrs. Proffitt stated that she had had a fire burning trash that morning and she had poured water onto the fire to put it out and during this conversation Mr. Proffitt was present and Robin [defendants' daughter] also."

The last of the conversational witnesses was Gary Foulk, a resident of Montier who was the proprietor of a service station on U.S. Highway 60 about two miles north of defendants' home. After sighting smoke from the fire, he "was there during the fire and after." In his conversation with defendants after the fire, he inquired whether he could be of any assistance to them and, upon their response in the negative, "*we went into the discussion of the cause of it* and they told me that they'd

been burning trash that morning but they had thought it was out."

Upon trial, defendants emphatically denied that either of them (a) had set a fire in the trash tub on the morning of the fire or (b) had so stated to plaintiff James, any of plaintiffs' witnesses, or for that matter anyone else. According to defendant Harrison, about 11:15 A.M. he had walked to the mailbox on the north-south country road some 75 feet east of his home and on that occasion had seen no smoke or fire but had "heard some kids playing . . behind the trailer." Both defendants insisted that they did not know how the fire started. Defendant Harrison said that, when pilot Bacher's repeated passes over the area prompted him to go outside and he discovered the northwest corner of the pumphouse on fire, the area then ablaze was not as large as that within the perimeter of the rough circle drawn by Bacher on the photographic exhibit—"it wasn't that big a circle; somebody is wrong." But, as we have noted, defendant Harrison quickly agreed that the southernmost portion of the area enclosed within Bacher's rough circle was "just a little north" of the open trash tub. There was no fire south of the pumphouse and between the back or west side of defendants' home and their trash tub.

■ Although defendants and their daughter denied that any of them had set a trash fire on the morning of April 8, 1970, four of plaintiffs' witnesses testified that defendants had said they burned trash that morning. Hence, the triers of the facts could have so found, for a party's admission against interest of a material fact relevant to an issue in the case is competent against him as substantive evidence of the fact admitted [Gaddy v. State Board of Registration for Healing Arts, Mo.App., 397 S.W.2d 347, 354(5); Scherffius v. Orr, Mo.App., 442 S.W.2d 120, 124–125] and may be of probative value if it bears on an issue incidentally or circumstantially, even though it be not a direct admission of the ultimate fact in issue. Bolivar Farmers

Exchange v. Eagon, Mo.App., 467 S.W.2d 95, 98(2), and cases there cited. But defendants' counsel insist that, even though the admissions of their clients would have permitted a finding that the latter set a trash fire that morning, findings that defendants were negligent and that their negligence was the direct and proximate cause of the destructive fire were impermissible. In considering these issues, we remain mindful of the fact, apparently overlooked by counsel, that the hereinbefore-quoted postfire statements of defendants to plaintiff James and to plaintiffs' witnesses Rockwell and Foulk were made (so the respective witnesses averred) in response to inquiries as to *"how the fire started"* or *"if something was said as to the cause of the fire"* or in *"discussion of the cause of it,"* and that, absent timely and appropriate objections to the questions or motions to strike the answers, the probative worth and effect of this testimony were for the jury. Steeley v. Kurn, 348 Mo. 1142, 1144, 157 S.W.2d 212, 213(4); Doyle v. St. Louis Merchants' Bridge Terminal Ry. Co., 326 Mo. 425, 432, 31 S.W.2d 1010, 1012(4), certiorari denied 283 U.S. 820, 51 S.Ct. 345, 75 L.Ed. 1435; Jones v. Fritz, Mo.App., 353 S.W.2d 393, 395(4); Ferrell v. Sikeston Coca-Cola Bottling Co., Mo.App., 320 S.W. 2d 292, 296(7); Vosburg v. Smith, Mo. App., 272 S.W.2d 297, 302(9); Ridenhour v. Oklahoma Contracting Co., Mo.App., 45 S.W.2d 108, 112(4).

When a property owner sets a fire on his own premises for a lawful purpose, he is not, in the absence of a statute to the contrary, liable for damages caused by the spread of such fire to the property of another unless he is negligent in starting or in controlling it. Steffens v. Fisher, 161 Mo.App. 386, 394, 143 S.W. 1101, 1103 (6); Belk v. Stewart, 160 Mo.App. 706, 713–714, 142 S.W. 485, 487(6); annotation 24 A.L.R.2d 241, 254. The measure of diligence required to free a property owner from liability for the spread of a fire lawfully set on his premises is ordinary care, i. e., such care, caution and diligence as a prudent and reasonable man would exercise, under the circumstances, to prevent damage to others [35 Am.Jur.2d Fires § 22, p. 602; annotation 24 A.L.R.2d 241, 259, 261], and what constitutes ordinary care depends upon the particular circumstances of the situation under consideration and is usually a question of fact unless the evidence is such that reasonable men could not infer negligence therefrom. Miller v. Sabinske, Mo.App., 322 S.W.2d 941, 946(4); 35 Am.Jur.2d Fires § 22, p. 602.

Of course, we agree with defendants' counsel that plaintiffs, to carry their burden of making a submissible case, were required to remove it from the realm of rank conjecture and surmise and to establish it by substantial evidence of probative value, or by inferences reasonably to be drawn from the evidence [Farnham v. Boone, Mo., 431 S.W.2d 154, 156(2)], i. e., by circumstantial evidence broadly defined as " 'evidence which, without going directly to prove the existence of a fact, gives rise to a logical inference that such fact does exist.' " Old Fortress, Inc. v. Myers, Mo.App., 453 S.W.2d 692, 695; 31A C.J.S. Evidence § 161, p. 440. It has been well said that "there is perhaps no question attended with greater uncertainty in its practical application than the question of when recovery may properly be justified in a given case by way of inference from the circumstances. This because of the obvious impossibility of laying down any hard and fast rule which can be applied to each and every situation, and by which it can be determined without room for honest dispute that the circumstances in the particular case are either sufficient or insufficient to warrant a finding of some additional fact as to which there is no direct evidence, but upon which liability may depend." Bowers v. Columbia Terminals Co., Mo.App., 213 S.W.2d 663, 670; Fellows v. Farmer, Mo.App., 379 S.W.2d 842, 847.

" '[T]he inference drawn must be reasonable, and may not be arrived at by

speculation or conjecture.[1] But neither is the inference to be precluded by speculation or conjecture, or by a mere possibility that the contrary may be true. . . . Probabilities, not possibilities, are controlling. It is not required that an inference be justified beyond all doubt.'" Pipes v. Missouri Pacific R. Co., Mo. (banc), 338 S.W. 2d 30, 36(9); Mauzy v. J. D. Carson Co., Mo.App., 189 S.W.2d 829, 833(4). See Elgin v. Kroger Grocery & Baking Co., 357 Mo. 19, 26–27, 206 S.W.2d 501, 506. As we said per Ruark, P. J., in Anderson v. St. Louis-San Francisco Railway Co., Mo.App., 367 S.W.2d 657, 659–660(4–6), a fire case, "the showing of circumstances must be such as indicates to reasonable minds the cause and source of the fire, not leaving it to mere conjecture or speculation, and must be sufficiently strong and complete to reasonably eliminate the 'probability' of any other source or cause (Miller v. Sabinske, Mo.App., 322 S.W.2d 941 [946]) . . . [and] [i]t is not sufficient that it *might* have so originated . . . . But the mere *'possibility'* that a thing could have happened in another way is not sufficient to destroy a reasonable inference as to how it did occur. Kelley v. Wabash R. Co., 151 Mo.App. 307 [311], 131 S. W. 718 [719]." In short, "to afford a substantial and sufficient basis for deductive reasoning in the determination of civil issues, circumstantial evidence need not have the quality of absolute certainty . . . ." Ferrell v. Sikeston Coca-Cola Bottling Co., supra, 320 S.W.2d at 297(8); Fellows v. Farmer, supra, 379 S.W.2d at 847. See McNamee v. Ehrhardt, Mo., 433 S.W.2d 318, 321(4).

 Furthermore, in determining the question of submissibility vel non, we must consider the evidence in the light most favorable to plaintiffs and must accord to them the benefit of all supporting inferences fairly and reasonably deducible from the evidence [Rooney v. Lloyd Metal Products Co., Mo., 458 S.W.2d 561, 563; Brubaker v. Moore, Mo., 432 S.W.2d 216, 217(1); Shelton v. Bruner, Mo.App., 449 S.W.2d 673, 676(1)]; we must bear in mind that the credibility of the witnesses and the weight and value to be accorded to their testimony were, in the first instance, matters peculiarly within the province of the jury [Chapman v. King, Mo.App., 396 S.W.2d 29, 34(6), and cases cited in note 4], in keeping with the time-honored principle that the jury may believe all or none of the testimony of any witness, or may accept it in part and reject it in part, just as it finds the same to be true or false when considered in relation to the other testimony and the facts and circumstances of the case [Capriglione v. Southwestern Bell Telephone Co., Mo., 376 S.W.2d 205, 206(2); Kickham v. Carter, Mo., 314 S.W. 2d 902, 905(1); Rakestraw v. Norris, Mo. App., 478 S.W.2d 409, 419(22)]; and we must recognize that a case should not be withdrawn from the jury unless the facts in evidence and the inferences fairly and reasonably deducible therefrom are so strongly against plaintiffs as to leave no room for reasonable minds to differ. Baumle v. Smith, Mo., 420 S.W.2d 341, 344(3); Hastings v. Coppage, Mo., 411 S. W.2d 232, 235(2); Bonenberger v. Sears Roebuck and Co., Mo.App., 449 S.W.2d 385, 388.

 In the final analysis, each fire case must be determined on its own unique state of facts. Miller v. Sabinske, supra, 322 S.W.2d at 947. Without reraking the testimonial ashes presented to us, it will suffice at this point to record our conclusion that instant plaintiffs made a submissible case on the issue of liability. As tending to support our view, see generally Miller v. Sabinske, supra; Jansen v. Aholt, Mo.App., 189 S.W.2d 121(1); Lee v. Allen, Mo.App., 120 S.W.2d 172(8–10); Erickson

---

1. "[T]he terms 'guesswork, conjecture, and speculation' are here used in the sense of reaching a conclusion by theorizing upon assumed factual premises outside of and beyond the scope of the evidence." Vinson v. East Texas Motor Freight Lines, Mo., 280 S.W.2d 124, 129.

v. Strickler, 252 Minn. 351, 90 N.W.2d 232; Gates v. Boston & Maine R. R., 255 Mass. 297, 151 N.E. 320; Deerfoot Farms, Inc. v. New York, N. H. & H. R. Co., 327 Mass. 51, 96 N.E.2d 872; annotation 24 A.L.R.2d 241.

Turning to the issue of damages, we first note the nature and character of the only evidence in this area, as found in the testimony of the two plaintiffs. Referring to a list prepared by himself and his wife, plaintiff James named certain individual items and other categories of personal property which had been in or under the trailer at the time of the fire. The only monetary figure mentioned in evidence with respect to many of those items was the amount plaintiffs "give" or "gave" therefor. E. g., plaintiffs "give $60" for a vacuum cleaner purchased five or six years prior to the fire, "give $150 apiece" for two bunk beds, including mattresses and springs, for the boys (date of purchase not stated), "give $100" for "a large bed . . . and everything" (date of purchase not stated), "gave [plaintiff James'] uncle $25" for a card table and four chairs (date of purchase not stated), "give $40" for a radio "probably" eight years prior to the fire, "give $129" for a portable Singer sewing machine "maybe" six years previously, paid $339 for a washer and dryer "four or five months I guess" previously, paid $120 for a repossessed dinette set (date of purchase not stated), "gave $80" for "a MI–30 caliber . . . in excellent condition . . . about three years" previously, "give $50" for a "22 rifle . . . about six years" previously, and "give $250" for a riding lawnmower (date of purchase not stated). To certain other items, plaintiff James assigned a "valuation" or "value," either expressly predicated upon original cost (e. g., a "cabinet type automatic record player" purchased seven to nine years prior to trial for $250 was "valued at $250") or offered with no indication of the basis therefor (e. g., a "nine years accumulation of . . . approximately fifty" record albums was "valued at $300," a record cabinet was "valued at $25," a living room suite was "valued

at $180," "all of our dishes and silverware and toaster and stuff like that—we valued them at $400," and "clothes for a family of four" were "valued at $3,000"). With respect to some items and categories of personalty, plaintiff James simply said that they were "worth" a certain sum [e. g., a 19-inch Philco television set on a stand was "worth $250" (plaintiff Sylvia subsequently stated that they had paid $250 for this item some five to seven years previously) and "$500 worth of jewelry" plaintiffs had "accumulated over a period of nine years"] or even more informally related that "I put $1,000 down [on the preprepared list from which he was testifying] for my tools and equipment and everything I had stored underneath the [trailer] house."

There was no evidence of the fair market value of any item or category of personalty prior to the fire and, on cross-examination, plaintiffs disclaimed any knowledge of such market value. In fact, when during the direct examination of plaintiff James the trial court called the attention of plaintiffs' counsel to the "before and after value" measure of damages rule in property damage cases, counsel responded that "the after value is nothing" and "the rule wouldn't apply"; and, in an objection near the beginning of plaintiff Sylvia's cross-examination, plaintiffs' counsel boldly declared that "she [plaintiff Sylvia] testified as to what they [certain burned items of personalty] would cost on a repurchase which is the test instead of what they would sell for." However, the issue of damages was submitted to the jury by instruction 6 which faithfully tracked the language of M.A.I. 4.02 (including the bracketed loss of use provision), the measure of damages instruction designated for use in cases involving property damage only. Instruction 6 directed the jury that, if the issue of liability was found for plaintiffs, they must be awarded "such sum as you may find from the evidence to be the difference between the fair market value of [the named items and categories of personalty] before they were damaged and their fair market value after they were

damaged," plus just compensation for loss of use thereof. As pointed out in the Committee's Comment under M.A.I. 4.02, that instruction states the well-established and long-recognized rule for determination of the sum allowable for property damage. Brunk v. Hamilton-Brown Shoe Co., 334 Mo. 517, 533, 66 S.W.2d 903, 910(23); Hall v. Clark, Mo., 298 S.W.2d 344, 350(13); Hood v. M. F. A. Mutual Ins. Co., Mo.App., 379 S.W.2d 806, 812(9).

■■■■■ "Fair market value" is "the price which property will bring when it is offered for sale by an owner who is willing but under no compulsion to sell and is bought by a buyer who is willing or desires to purchase but is not compelled to do so." Carter v. Matthey Laundry & Dry Cleaning Co., Mo., 350 S.W.2d 786, 794(11). Cf. Albrecht v. Herald Co., 8 Cir., 452 F.2d 124, 131(6). And see M.A.I. 16.02 defining "fair market value" in eminent domain cases. Thus, the before-and-after fair market value rule in M.A.I. 4.02 undertakes to strike an equitable balance between the competing poles of subjective self-serving opinions as to value usually entertained by a seller and a buyer and naturally inherent in the predispositions of opposing parties litigant; and the statement of instant plaintiffs' counsel to the trial court that this rule becomes inapplicable when "the after value is nothing" finds no support in reason or cited authority. Neither original cost nor plaintiffs' subjective opinions as to "value" or "worth" of used articles of personalty may be equated with or substituted for "fair market value." Searching examination of the transcript before us impels the blunt and inescapable conclusion that there simply was no evidence from which the triers of the facts properly could have found the fair market value of plaintiffs' personalty immediately before the fire.

■■■■■ Adoption of M.A.I. instructions has not changed or eliminated the fundamental requirement that an issue submitted in an instruction must be supported by substantial evidence from which the jury rea-

sonably may find such issue. Gathright v. Pendegraft, Mo., 433 S.W.2d 299, 313(24); Brassfield v. Sears, Mo., 421 S.W.2d 321, 323(1). See Martin v. Yeoham, Mo.App., 419 S.W.2d 937, 946(4); Swiastyn v. St. Joseph Light & Power Co., Mo.App., 459 S.W.2d 24, 32(9). Instant plaintiffs did not make a submissible case on the issue of damages as that issue was properly framed in instruction 6.

One other point is presented for consideration, i. e., that the trial court erred in failing to declare a mistrial and discharge the jury pursuant to the request of defendants' counsel immediately after plaintiffs' attorney, during his opening statement to the jury, said: "Now they [plaintiffs] had purchased this mobile trailer under contract which (sic) most people purchase things these days and it was insured. The insurance company paid them for the mobile trailer but *all of their personal belongings were uninsured and they were lost.*" Immediately following denial of their request for a mistrial, defendants' counsel moved that the jury be instructed to disregard the quoted statement of plaintiffs' attorney, and the trial court promptly sustained that motion and proceeded so to instruct the jury.

■■■■ The gross impropriety of unwarranted injection of insurance coverage or noncoverage into a jury-tried case has been discussed in innumerable cases, and our views in this area, as recorded in Hildreth v. Key, Mo.App., 341 S.W.2d 601, 615–616 (31–33), and confirmed in Collins v. Nelson, Mo.App., 410 S.W.2d 570, 577(11), have neither changed nor softened. Where insurance coverage is outside of the issues in the case and where nothing has been said or done from which the jury reasonably might infer that a *defendant* has insurance protection against the loss in litigation, it is improper and erroneous for such *defendant* to show that he does not have insurance protection. Conrad v. Twin Oaks, Inc., Mo. App., 344 S.W.2d 286, 288(2). And in similar circumstances it logically should be and is just as improper and erroneous for a

*plaintiff* to show that he does not have insurance which will reimburse him for the loss in litigation. Thus, in Lee v. Osmundson, 206 Minn. 487, 289 N.W. 63, 65(4), a suit for property damage to plaintiff's truck resulting from a collision with defendants' vehicle, the Supreme Court of Minnesota declared that "counsel for plaintiff made extensive inquiry to show that plaintiff had only liability coverage. The obvious inference is that he did not have collision insurance to protect him from loss to his own property. This, of course, was clearly inadmissible. It was foreign to the issues of the case and immaterial to the proof of the cause of action. Introduction of such testimony can serve but one purpose." Although reversal and remand had been found necessary for reasons theretofore discussed, the court concluded with the caveat that "we could not and would not approve a verdict for plaintiff should he ultimately succeed if such testimony were again introduced." 289 N.W. at 66. We reject out of hand the labored argument in plaintiffs' brief, unsupported by authority, that a distinction should be drawn between statements or evidence about "no insurance," such as the statement of plaintiffs' counsel in the case at bar, and statements or evidence indicating "no *liability* insurance."

■ As is true with respect to an improper showing of insurance [e. g., Barger v. Green, Mo.App., 255 S.W.2d 127, 129–130], an improper showing of *no* insurance does not automatically or always result in prejudicial error that necessitates declaration of a mistrial and discharge of the jury. Conrad v. Twin Oaks, Inc., supra, 344 S.W.2d at 288. Where, as here, the trial court promptly sustains a motion to disregard a statement of that character by counsel or a witness, the decision as to whether or not a mistrial should be declared rests primarily within the sound discretion of that court; and absent a manifest abuse of that discretion an appellate court should not interfere. Conrad, supra, 344 S.W.2d at 288–289(4, 5). See Gathright v. Pendegraft, supra, 433 S.W.2d at 306(6, 7). Such manifest abuse of the judicial discretion vested in the trial court is found "when there is rendered an erroneous conclusion in judgment, one that is clearly against logic and the effect of facts before the court or the reasonable, probable and actual deductions to be drawn from such facts and circumstances." Conrad, supra, 344 S.W.2d at 289(6). Of course, whether an appellate court properly should find such manifest abuse of the trial court's judicial discretion in any given case depends upon, and must be determined in the light of, all of the facts and circumstances in that particular case as preserved in the transcript on appeal. Since careful consideration of the record here under review leaves us unable to declare confidently such manifest abuse of the trial court's judicial discretion by reason of his refusal to declare a mistrial and discharge the jury, this point is ruled against defendants. However, it may not be inappropriate to add the warning that upon retrial on the issue of damages any indication by plaintiffs or their counsel before the jury that there was no insurance on the burned personalty will be regarded here as a deliberate interjection of this improper element and will be sufficient to work a reversal upon appeal.

■ Having found no reversible error materially affecting the merits insofar as the issue of liability is concerned [V.A. M.R. Rule 84.13(b)], the judgment of the Circuit Court of Shannon County on the issue of damages should be set aside and the cause should be remanded for a new trial on that issue only. V.A.M.R. Rule 84.-14; DeMoulin v. Kissir, Mo.App., 446 S.W.2d 162, 166(7); Watts v. Handley, Mo. App., 427 S.W.2d 272, 276(4); Leavitt v. St. Louis Public Service Co., Mo.App., 340 S.W.2d 131, 141(16). It is so ordered.

TITUS, C. J., and HOGAN, J., concur.

BILLINGS, J., not participating, because not a member of the court when this cause was submitted.